**GTE SYLVANIA INCORPORATED,**
**Appellant,**

v.

**CONTINENTAL T. V., INC., a**
**corporation, et al., Appellees.**

**No. 71–1705.**

United States Court of Appeals,
Ninth Circuit.

April 9, 1976.

M. Laurence Popofsky (argued), of Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for appellant.

Lawrence A. Sullivan (argued), Berkeley, Cal., for appellees.

## OPINION

Before CHAMBERS, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, KILKENNY, CHOY, GOODWIN, WALLACE, and SNEED, Circuit Judges.*

* Judges Koelsch and Trask recused themselves and did not participate in any aspect of this appeal. Senior Judge Kilkenny exercised his statutory prerogative to participate, pursuant to the provision of the last sentence of 28 U.S.C. § 46(c). Judge Kennedy did not participate because he did not assume his judicial position until after the full court heard the oral

ELY, Circuit Judge:

Pursuant to a jury verdict in a private antitrust action, a judgment and an equitable decree were entered in favor of the appellees (hereinafter, collectively, "Continental") and against the appellant (hereinafter "Sylvania"). On this appeal by Sylvania, the critical issue is whether the district judge erred in concluding, and instructing the jury accordingly, that, under the supposed rationale of *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), Sylvania's practice of fixing by agreement the locations from which Continental was authorized to sell Sylvania's products was illegal *per se* under Section 1 of the Sherman Act. For the many reasons set forth below, we reverse.[1]

### I. *Factual Background*

Sylvania, a corporate subsidiary of General Telephone and Electric, manufactures and sells radios and television sets through its Home Entertainment Products Division. Though Sylvania emerged from World War II as one of the major manufacturers in the television industry, its share of the market never became large. In the post-war era, when only black and white television was the industry's major product line, a single competitor, RCA, enjoyed sixty to seventy percent of the market, and the remainder was divided among Sylvania and 130 other manufacturers. During the so-called black and white era, most television manufacturers engaged in a relatively unselective "saturation" method of distribution. Essentially, this system involved the sale of television sets both to independent and manufacturer-owned distributorships, without any limit on the number of dealers in a given locale. The goal of such a system was to generate as much volume as possible; therefore, manufacturers sought to sell to as many dealers as possible.

By 1962 Sylvania's sales volume had decreased to a relatively tiny portion of the television market, between one and two percent, approximately. Prior to 1962 Sylvania's practice was to sell its products primarily to distributors, some of which it owned. These distributors sold, in turn, to retailers. At about this time Sylvania determined that its attempt to utilize the saturation type of distribution in competition, especially with RCA and Zenith, could not be successful. Hoping to revive itself as an effective interbrand competitor, and to avoid the virtually certain possibility that it would be compelled to surrender the business of manufacturing and selling television sets,[2] Sylvania decided to abandon its

arguments of counsel and thereafter conducted its private deliberations.

1. The majority and dissenting opinions of the panel first concerned with the appeal, unofficially reported in 1974–1 Trade Cas. ¶ 75,072 (9th Cir. May 9, 1974), was withdrawn by the full court's Order of December 19, 1974. The original majority opinion has been the subject of a number of law review commentaries. See Robinson, *Recent Antitrust Developments— 1974*, 75 Colum.L.Rev. 243 (1975), and the case notes at 88 Harv.L.Rev. 636 (1975); 26 Mercer L.Rev. 629 (1975); 53 N.C.L.Rev. 775 (1975); 49 N.Y.U.L.Rev. 957 (1975); 53 Tex.L.Rev. 127 (1975); 10 Colum.J.L. & Social Prob. 497 (1974).

2. Certain testimony indicated that Sylvania instituted its elbow room policy in order to avoid being driven out of the television market. Ray J. Steiner, at the time of trial the Vice President of Sony Corporation of America, and prior to April, 1969, the National Sales Manager of Sylvania, testified as follows:

". . . basically elbow room was as a result of the fact that as a company we were in trouble. By that I mean that we needed something, a sales pitch that the sales company could use *in order for us to get a foot hold in the market.*

Basically we were competing with RCA, Zenith, Magnavox, Motorola, private brands, and very frankly *we were not doing a good job.*

So the elbow room is basically a selective or limited distribution approach that has been used by other companies in the business, for example, Magnavox, Frigidaire, and we decided that we could no longer have a me too approach to the dealers.

Because if we were in a me too approach or the same type of approach as RCA or Zenith, basically there was no reason for the dealers to handle our line because they could handle other lines.

\* \* \* \* \* \*

We knew that if the advent of this program, if it didn't work and we didn't keep our plant running in Batavia, there was the alter-

former method of saturation distribution and begin a program of selective distribution.[3] Sylvania's management apparently believed that it could become a more effective competitor in the then rapidly expanding market for color television if it could develop a prestige image and a network of dealers with sufficient loyalty to Sylvania to market Sylvania products aggressively.

In 1962, as part of a reorganization of its Home Entertainment Products Division, Sylvania implemented its new selective distribution system by phasing out both its wholesale distributors and its own factory distributorships. These were replaced by a "straight line distribution" system (SLD), under which sales were made from the factory directly to franchised dealers, who in turn sold to consumers. This program, which Sylvania called its "elbow room policy," involved the use of franchises to limit the number of Sylvania retail dealers. Sylvania hoped to attract dealers willing to identify themselves as authorized Sylvania outlets in exchange for the opportunity to earn fair profits.

An essential element of Sylvania's "elbow room policy" was the practice of franchising by location. Under this policy Sylvania sold its products only to selected retailers, who were identified as authorized Sylvania deal-ers, and who were authorized to sell Sylvania products only at designated locations. There were agreements[4] between Sylvania and its dealers that the dealer would not move Sylvania brand merchandise to a new unapproved location for resale without the prior approval of Sylvania.

Sylvania made specific efforts to avoid anticompetitive practices. No dealer was given an exclusive dealership for a particular area. In Northern California, for example, Sylvania had at least two or more authorized dealers serving every major metropolitan market larger than the City of Salinas. No dealer had the power to veto Sylvania's decision to approve an additional franchise location in a given market area. There were no agreements that in any way restricted the freedom of authorized Sylvania dealers to sell to anyone who came to their franchise location, regardless of the customer's place of residence.

The record contains evidence suggesting that this "elbow room policy" was moderately successful in improving Sylvania's competitive position. Sylvania asserts that due to its selective distribution policy and its practice of franchising by location, it became able to attract effective, aggressive dealers. With the growth of the color television market, Sylvania increased its mar-

native that *we would probably go out of the television business.*" (Record at 2543–44) (Emphasis added).

* * * * * *

. . . the result was that it [the elbow room policy] was successful. We did get a foothold in the market place and we were able to compete with the big boys in the business and it got the onus off our back *that we were going out of business.*" (Record at 2554) (Emphasis added).

William E. Boss, Jr., the Vice President of Marketing for Sylvania, testified that the purpose of the elbow room policy was:

". . . really to enable us and our retailers *to survive* profitably, to effectively compete in a marketplace. Limited distribution merely means that there are less dealers in a given area. We have, for example, perhaps *one-sixth of the dealers of our competition,* but by having a limited distribution policy we feel that we can develop a more mutually profitable business with the retailer.

If we were to go out and compete with the majors *we would not be successful.*" (Emphasis added).

3. Selective distribution was pioneered in the late 1950's by another company, Magnavox, which held only a small share of the television market. By utilizing this method of distribution, as above noted, Sylvania was able to increase its share of the market to approximately five percent, thereby becoming an effective interbrand competitor.

4. At trial Sylvania denied that its elbow room policy involved any express or implied agreement with its franchised dealers concerning the movement of television sets. Sylvania insisted that its elbow room policy was implemented unilaterally by an announcement. However, for purposes of this appeal Sylvania has deferred to the implied findings of the jury and has argued its appeal upon the assumption that an implied agreement existed between Sylvania and its dealers prohibiting the shipment of inventory to unauthorized locations.

ket share from about one or two percent in 1962 to about five percent by 1965. By the mid-1960's Sylvania had emerged as a vigorous competitor, ranking as the nation's eighth largest manufacturer and seller of color television sets.

The appellees, Continental, are a group of affiliated corporations with common ownership. The principal operating officer of Continental, together with his wife, owned substantially all of the stock of the corporations. Continental began business in 1960 as a retail dealer of radios and television sets in San Jose, California. Its primary sales territory included most of Santa Clara County, and its inventory consisted principally of television sets manufactured by Muntz T. V., Inc. Continental prospered, and in 1964 it replaced its downtown San Jose store with a larger suburban facility in a region known as the Stevens Creek area. In the 1960–64 period Continental had no credit arrangements for floor financing of its inventory with either Muntz, or any bank or credit institution. It handled its customer credits largely through a local bank in San Jose.

In May, 1964, Sylvania attracted Continental to become an authorized Sylvania dealer and granted franchises to Continental for several locations. In July, 1964, Continental began financing its purchases of Sylvania merchandise with the "Maguire plan," under which Continental executed a promissory note for the price of inventory purchased from Sylvania, with payment secured by a trust receipt in favor of John P. Maguire & Co., Inc., a national finance company. Continental was obligated to repay Maguire Continental's cost for each television set immediately after the set was sold (or six months after Continental's receipt of unsold merchandise). Sylvania maintained some control over the amount of credit to be extended to Continental, because in the event of Continental's default, Maguire had full recourse against Sylvania.

Continental expanded rapidly. By May, 1965, it had become one of the largest Sylvania dealers in the country,[5] operating Sylvania franchises at eight locations in the California counties of San Francisco, Santa Clara, San Mateo, and Alameda. In the spring of 1965 Continental learned that Sylvania was planning to franchise another dealer, Young Brothers, at a location on Geary Street in San Francisco, about one mile from one of Continental's outlets. Continental allegedly believed that the franchising of this location would violate the spacing concept underlying the "elbow room policy". It therefore strenuously objected and threatened to reappraise its need for Sylvania merchandise in its San Francisco store. In June, 1965, Sylvania franchised the Young Brothers store. Continental thereupon canceled a very large Sylvania order, placed a half-million dollar order with a Sylvania competitor called Philco, and advised Sylvania that Continental would reduce its further purchases from Sylvania.

In March, 1965, Continental had notified Sylvania that it wished to enter the Sacramento, California, market. In compliance with Sylvania's policy, Continental had initially agreed not to sell Sylvania merchandise from a Sacramento location without Sylvania's prior approval. As he had previously done when Continental opened a store at a new location, Continental's principal operating officer organized a new corporate affiliate (S.A.M. Industries, Inc.) and, through that affiliate, leased a Sacramento location about one mile from another Sylvania dealer, Handy Andy. In early September, 1965, Continental advised Sylvania of the location of the new Continental store in Sacramento and requested approval for a franchise to sell Sylvania products there. Sylvania replied that approval would be denied. Thereafter, Continental moved Sylvania merchandise into the Sacramento store. According to some of the testimony, Sylvania refused Continental's request for a Sacramento franchise because Sylvania's

5. In 1965, Continental opened five new stores. Its sales volume exceeded $1,000,000, and it had a $300,000 line of credit with Sylvania.

management believed that Sylvania's distribution in the area was already sufficient and that additional Sylvania retail outlets would be undesirable. On September 7, 1965, Continental decided that it would violate the locations agreement that it had made with Sylvania and proceed to sell Sylvania merchandise in Sacramento without Sylvania's approval. One of Sylvania's contentions is that Continental's move into the Sacramento area was made in retaliation for Sylvania's decision to franchise Young Brothers in San Francisco and represented an attempt by Continental to pressure Sylvania into revoking the Young Brothers franchise.

While all these events were occurring in Sacramento, credit personnel at Sylvania's headquarters had become deeply concerned over Continental's ability to meet its obligations under its financing arrangements. Sylvania had received information sometime prior to June, 1965, that Continental's principal shareholder and chief operating officer had a criminal record. Sylvania ordered and received a Dun and Bradstreet report which confirmed that the chief officer had a military conviction while in the Marine Corps for misappropriation of government funds and issuing worthless checks. A second alleged cause for the concern of Sylvania's credit personnel was the fact that Continental had substantially increased its obligations to Philco by a capital loan and a $500,000 order for Philco products. This was in addition to Continental's existing high credit limit, $300,000, with Sylvania. Additionally, Continental had failed to pay past due obligations for its purchase of Sylvania products. These obligations were held by Maguire for Sylvania and were passing into maturity and then delinquency stages. Finally, on September 24, 1965, Continental informed Sylvania that pending resolution of the dispute over Continental's new Sacramento store, all of its future obligations would be paid as they matured by the deposit of checks with its, Continental's, own attorneys.

Because of its concern, Sylvania's credit department placed a credit hold on Continental's orders and on September 16, 1965, reduced Continental's credit line from $300,000 to $50,000. In reaction to the credit reduction, Continental withheld all payments due to Maguire. This refusal to make payment continued for over three weeks until Continental owed $62,000 to Sylvania, unsecured by any merchandise. At that time Maguire instituted suit against Continental for the amount due, repossessed the Sylvania merchandise in Continental's possession, levied attachments on Continental's places of business and bank account, and caused Continental's San Jose stores and central warehouse to be closed. A bank with which Continental had done business terminated Continental's consumer financing program and called for the payment of a commercial loan. Finally, Sylvania notified Continental that Continental's franchise as a Sylvania dealer was terminated.

Continental sought damages from both Sylvania and Maguire, alleging violations of the antitrust laws and tortious injury to its business and property, a pendent claim under California law. Continental alleged that Sylvania's credit actions were not based upon a genuine concern about Continental's solvency, but rather were undertaken to enforce the location restriction and to prevent Continental from selling Sylvania merchandise from the unauthorized Sacramento location. Continental further asserted that Sylvania's "elbow room policy" was a policy in restraint of trade, constituting a *per se* violation of Section 1 of the Sherman Act. Damages were alleged to have resulted from Sylvania's termination of its relationship with Continental and Continental's resulting inability to procure substitute products during a period of product shortage. Continental also sought an injunction prohibiting Sylvania from enforcing its locations restrictions. Continental's antitrust and tort claims were submitted to the jury. The jury returned a verdict in favor of Continental [6] and found

---

6. The jury's verdict was returned in the form of answers to special interrogatories. The verdict in respect to the antitrust claim is as follows:

A. *Antitrust Claim*
1. Did Sylvania Electric Products, Inc. engage in a contract, combination, or conspir-

that Continental had been damaged in the amount of $591,505. The jury decided that John P. Maguire & Co., the only other defendant, had not engaged in a combination, contract, or conspiracy in restraint of trade in violation of the antitrust laws. Finally, the jury exonerated both Sylvania and Maguire on Continental's pendent tort claim under California law. Trebling the damages pursuant to 15 U.S.C. § 15, the district judge entered judgment against Sylvania in the amount of $1,774,515. In addition, the court awarded Continental attorney's fees in the sum of $275,000.

acy in restraint of trade in violation of the antitrust laws with respect to location restrictions and price fixing as an integral part of a single distribution policy?

Yes ___ No X

2. Did Sylvania Electric Products, Inc. engage in a contract, combination, or conspiracy in restraint of trade in violation of the antitrust laws with respect to locations restrictions alone?

Yes X No ___

3. Did John P. Maguire & Co., Inc. engage with Sylvania in a contract, combination or conspiracy:
a. As described in Question 1 above?

Yes ___ No X

b. As described in Question 2 above?

Yes ___ No X

4. If the answer to Question 1, 2, or 3 is "yes", did Continental T. V., Inc., sustain damage to its business or property as a proximate result of such violation of the antitrust laws?

Yes X No ___

5. If the answer to Question 4 is "yes", what is the amount of such damage?
$591,505

7. The trial judge's finding on this point appears to be in conflict with the finding of the jury that Maguire and Sylvania were not involved in any contract, combination, or conspiracy to enforce the location restriction. When issues common to both legal and equitable claims are to be tried together, the legal issues are to be

■ On Continental's prayer for equitable relief, the district judge entered findings of fact and conclusions of law. The non-jury court found that Sylvania had requested Maguire to sue Continental on its outstanding notes as a part of Sylvania's attempt to prevent Continental from selling Sylvania products in Sacramento.[7] Further, the court found that Sylvania's credit concerns were not the true reason for Sylvania's actions. The court entered a limited injunction,[8] prohibiting Sylvania from enforcing its location clause.[9]

tried first, and the findings of the jury are binding on the trier of the equitable claims. *Beacon Theatres v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). We therefore rely upon the findings of the jury if they appear to be inconsistent with findings of the trial judge.

8. Since the incidental injunctive relief granted below was predicated upon the application of an erroneous legal standard (*See* the District Court's conclusion of law No. 5, quoted *infra* note 9), the equitable Decree, in addition to the legal Judgment, must be vacated. *See United States v. Parke Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505, 515 (1960); *Beverage Distributors, Inc. v. Olympia Brewing Co.*, 440 F.2d 21 (9th Cir.), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971).

9. The district judge entered findings of fact and conclusions of law pertaining to the equitable Decree. The most significant conclusions are as follows:

"3. Sylvania, during the time involved herein, and in violation of Section 1 of the Sherman Act, did engage in a contract, combination or conspiracy with its retail dealers, including Handy Andy and Continental, pursuant to which it restricted and enforced its location distribution policy and imposed a system of location restraints upon its retail dealers limiting for all practical purposes the areas in which they could display and sell Sylvania brand products which the dealers had purchased from Sylvania and which were owned by them.

4. As a proximate result of Sylvania's conduct as above described, Continental sustained damage to its business and property as found by the jury. Moreover, equitable relief having been granted in the Judgment heretofore entered on the 11th day of December, 1970, the Court deems it necessary to enter in support thereof, Findings of Fact and Conclusions of Law contained herein.

Sylvania's principal contention here is that the district judge erred in basing both the jury instructions and the grant of equitable relief on the theory that by seeking to restrict the locations from which Continental could sell Sylvania products, Sylvania had committed a *per se* violation of Section 1 of the Sherman Act. Over Sylvania's objection, the trial judge instructed the jury as follows:

"Therefore, if you find by a preponderance of the evidence that Sylvania entered into a contract, combination or conspiracy with one or more of its dealers pursuant to which Sylvania exercised dominion and control over the products sold to the dealer, after having parted with title and risk to the products, you must find any effort thereafter to restrict outlets or store locations from which its dealers resold the merchandise which they had purchased from Sylvania to be a violation of Section 1 of the Sherman Act, regardless of the reasonableness of the location restrictions." [10]

In deciding that the *per se* rule of *United States v. Arnold, Schwinn & Co.,* 388 U.S.

365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), was applicable to Sylvania's location restrictions, the court rejected instructions requested by Sylvania under which the jury would have been told that Sylvania's locations practice was illegal only if it *unreasonably* restrained competition in the market for television sales.[11]

Once the instruction incorporating the theory of *per se* illegality was submitted, a verdict against Sylvania was virtually assured. Sylvania never denied the existence of its locations practice, which by definition admittedly "restrict[ed] outlets or store locations from which its dealers resold the merchandise which they had purchased from Sylvania . . . ." It is not entirely clear from the jury instructions and the findings of fact and conclusions of law entered on the equitable claim whether Sylvania was found to have committed an illegal *per se* violation merely because it entered the agreement restricting Continental to specific locations, or because of the subsequent enforcement of that agreement. We think it irrelevant as to whether both, or only one, of these considerations were applied, since we hold that under either, the

---

5. The foregoing restraints are *per se* violations of Section 1 of the Sherman Act, inasmuch as Sylvania made sales to its retailers upon 'condition, agreement or understanding limiting the retailers freedom as to where and to whom it will resell the products', these sales having been made 'subject to territorial restrictions upon resale.' *United States v. Arnold[,] Schwinn & Co.,* 388 U.S. 378–379 [87 S.Ct. 1865–1866, 18 L.Ed.2d 1259–1260], (1967)."

10. The trial judge in this case was the distinguished Associate Justice Tom C. Clark (Ret.), sitting by designation in the District Court. In formulating his jury instructions, Justice Clark apparently adopted some of his own dissenting comments in *White Motor Co. v. United States,* 372 U.S. 253, 275, 83 S.Ct. 696, 708, 9 L.Ed.2d 738, 753 (1963). There, the majority of the Court, against the will of Mr. Justice Clark, declined to establish a broad *per se* rule regarding all vertical territorial restraints.

11. The court also rejected a jury instruction proposed by Sylvania which propounded the theory that even if the Schwinn *per se* rule were applicable to locations restrictions, Sylvania would be exonerated if it could prove a

"failing company" defense. The rejected instruction reads as follows:

"If you find such a contract, combination or conspiracy to restrain movement or sale of merchandise, such a practice would be presumptively unlawful. However, before you can find it to be a violation of the antitrust laws, you must consider whether it was justified. In this case, such a restriction would be justified if Sylvania had proved by a preponderance of the evidence that *the adoption of such a restriction was reasonably necessary to enable Sylvania to remain in the television business* or to enable it to increase the strength and effectiveness of its competitive efforts in the television industry. If you find that such justification has been shown, you should find that Sylvania and Maguire have not violated the antitrust laws. If you find that Sylvania has not proved such a justification by a preponderance of the evidence, and if you find the existence of a contract, combination or conspiracy to restrict movement or sale of merchandise, as I have defined it above, then you should find that Sylvania has violated the antitrust laws." (Emphasis added).

court's application of the law was clearly erroneous.

## II. *Analysis*

■ We confront an important and intriguing question, i. e., whether the rule of *per se* illegality established by the Supreme Court in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), should be extended to embrace the "locations practice" utilized by Sylvania and others as a method of modern product distribution systems. The trial judge, applying a bit of the literal language of *Schwinn* without reference to its context or the specific facts of that case, determined to extend that language to encompass locations clauses. Accordingly, Sylvania's proffered "rule of reason" jury instruction was rejected. Our study has convinced us, beyond doubt, that the challenged conclusion reflects a misinterpretation of *Schwinn*, is inconsistent with the existing law permitting exclusive dealerships, and, most importantly, would seriously undermine, rather than implement, the major purpose of the Sherman Act. That purpose is to insure the "unrestrained interaction of competitive forces" that "will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." *Northern Pacific Ry. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545, 549 (1958). We therefore hold that the legality of the locations clauses here involved should be judged under what is commonly referred to as the "rule of reason," rather than a rule of *per se* illegality. We are convinced that a contrary holding would constitute an unwarranted "body blow" to legitimate business enterprise and would place our free capitalistic system under stifling restraints, never contemplated or intended by the Congress. The "rule of reason" should have been applied, permitting inquiry into the competitive effect and reasonableness of the locations agreement in question.[12]

### A. *The Schwinn Precedent in Context*

In ruling that Sylvania's locations practice was illegal *per se*, the trial judge chose to apply, literally, the following sweeping language from the opinion of Mr. Justice Fortas for the Court in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967):[13]

---

12. We think it noteworthy that *all* of the law review commentators who have undertaken a detailed analysis of the decision of our court's original panel have reached the conclusion that the District Court's application of a *per se* rule of illegality was wholly inappropriate and that, in light of the purposes of the Sherman Act, the "rule of reason" should have been applied. Robinson, *Recent Antitrust Developments—1974*, 75 Colum.L.Rev. 243, at 278–79 (1975); 88 Harv.L.Rev. 636, 641–42, 648 (1975); 26 Mercer L.Rev. 629, 637 (1975); 53 N.C.L.Rev. 775, 784–85 (1975); 49 N.Y.U.L.Rev. 957, 969 (1975); 53 Texas L.Rev. 127, 134–37 (1974).

13. If we thought the opinion of Mr. Justice Fortas in *Schwinn* to control our present decision, our duty would compel us to apply *Schwinn*. And this we would do, despite the fact that the opinion of Mr. Justice Fortas has frequently been criticized for the breadth of a small portion of its language and its primary reliance upon the "ancient rule against restraints on alienation," 388 U.S. at 380, 87 S.Ct. at 1866, 18 L.Ed.2d at 1261, a rule described in Mr. Justice Stewart's dissent as a "wooden and irrelevant formula." *Id.* at 394, 87 S.Ct. at 1873, 18 L.Ed.2d at 1268. *See generally* Comegys, Moderator, *Restraints in Distribution: General Motors, Sealy and Schwinn, a Symposium on Ancillary Restrictions*, 36 ABA Antitrust L.J. 84 (1967); Handler, *Twenty-Fifth Annual Antitrust Review*, 73 Colum.L.Rev. 415, 458–59 (1973); Handler, *The Twentieth Annual Antitrust Review—1967*, 53 Va.L.Rev. 1667, 1680–86 (1967); Keck, *The Schwinn Case*, 23 Bus.Lawyer 669 (1968); McLaren, *Marketing Limitations on Independent Distributors and Dealers—Prices, Territories, Customers, and Handling of Competitive Products*, 13 Antitrust Bull. 161, 168 (1968); Orrick, *Marketing Restrictions Imposed to Protect the Integrity of 'Franchise' Distribution Systems*, 36 ABA Antitrust L.J. 63, 69–72 (1967); Pollack, *Antitrust Problems in Franchising*, 15 N.Y.L.F. 106, 110–13 (1969); Pollack, *Alternative Distribution Methods After Schwinn*, 63 Nw.L.Rev. 595 (1968); Sadd, *Territorial and Customer Restrictions After Sealy and Schwinn*, 38 U.Cin.L.Rev. 249 (1969); Williams, *Distribution and the Sherman Act—The Effects of General Motors, Schwinn and Sealy*, 1967 Duke L.J. 732, 740

"Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act.[14]

388 U.S. at 382, 87 S.Ct. at 1867, 18 L.Ed.2d at 1262.

We reiterate our view that this language, in isolation, was applied too literally, without sufficient reference to the textual context in which it appears or the facts from which *Schwinn* arose. Furthermore, a fundamental antitrust principle which our own court stressed in *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), was apparently overlooked. Quoting from *Maple Flooring Manufacturers Association v. United States*, 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093, 1100 (1925), we emphasized in *Hawaiian Oke* the Supreme Court's admonition that:

> ". . . each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and . . . the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new

case to which the rule of earlier decisions is to be applied."

416 F.2d at 79.

In *Schwinn* the Supreme Court held illegal *per se* a system of vertical restraints affecting both wholesale and retail distribution. Arnold, Schwinn & Company had created exclusive geographical sales territories for each of its 22 wholesaler bicycle distributors and had made each distributor the sole Schwinn outlet for the distributor's designated area. Each distributor was prohibited from selling to any retailers located outside its territory. Moreover, the restrictions in *Schwinn* limited the classes of customers to whom Schwinn's wholesale distributors and franchised retailers could sell, by prohibiting them from selling Schwinn products to unfranchised retailers. Consequently, Schwinn's system completely barred sales to some potential purchasers of Schwinn products, regardless of where these customers were located. The *Schwinn* restrictions on classes of persons or particular persons to whom a distributor may not sell have been termed "customer" restrictions, while the restrictions against selling to customers outside a certain area are classified as "territorial" restrictions.[15]

In our present case Sylvania imposed neither of the restrictions that *Schwinn* appropriately condemned. Schwinn's territorial restrictions requiring dealers to confine their sales to exclusive territories prescribed by Schwinn prevented a dealer from

---

(1967); Note, *Restrictive Distribution Arrangements after the Schwinn Case*, 53 Cornell L.Rev. 515 (1967); *The Supreme Court, 1966 Term*, 81 Harv.L.Rev. 69, 235–38 (1967); Note, *Territorial Restrictions and Per Se Rules—A Re-evaluation of the Schwinn and Sealy Doctrines*, 70 Mich.L.Rev. 616 (1972); Comment, *Vertical Territorial Restraints and the Per Se Concept*, 18 Buffalo L.Rev. 153, 161 (1969); Comment, *The Impact of the Schwinn Case on Territorial Restrictions*, 46 Texas L.Rev. 497, 511 (1968).

**14.** The District Court may also have relied, to some extent, and with some justification, upon certain additional isolated language from *Schwinn*.

"Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to

restrict and confine *areas or persons* with whom an article may be traded after the manufacturer has parted with dominion over it. *White Motor, supra; Doctor Miles, supra.* Such restraints are so obviously destructive of competition that their mere existence is enough." 388 U.S. at 379, 87 S.Ct. at 1865, 18 L.Ed.2d at 1260. (Emphasis added).

**15.** Pollack, *Alternative Distribution Methods after Schwinn*, 63 Nw.U.L.Rev. 595 (1968); Williams, *Distribution and the Sherman Act—The Effects of General Motors, Schwinn and Sealy*, 1967 Duke L.J. 732; Note, *Vertical Customer and Territorial Restrictions and the Sherman Act*, 63 Nw.U.L.Rev. 262 (1968); Note, *Restrictive Distribution Arrangements after the Schwinn Case*, 53 Cornell L.Rev. 514 (1968).

competing for customers outside his territory. In contrast, Sylvania's dealers could sell to customers from any area, could advertise in any area, and were limited only as to the location of the franchisee's place of business. Schwinn's restrictions guaranteed each wholesale distributor that it would be absolutely isolated from all competition from other Schwinn wholesalers. Sylvania, on the other hand, franchised competing dealerships at will, and in the major metropolitan markets in Northern California such competing dealers were located within the 25 to 30 mile radius of volume selling. Schwinn's territorial restrictions were tied to customer restrictions, but a Sylvania dealer could sell to anyone, just so long as the dealer's store remained in the approved location.

Thus a critical and very obvious distinction between the restrictions in *Schwinn* and those of Sylvania is that *Schwinn* involved a restriction on the locations and types of permissible *vendees*, while Sylvania only imposed restrictions on the permissible locations of *vendors*. When *Schwinn's* proscription of restrictions on "territory or persons to whom the product may be transferred", 388 U.S. at 382, 87 S.Ct. at 1867, 18 L.Ed.2d at 1262, and on "areas or persons with whom an article may be traded", 388 U.S. at 379, 87 S.Ct. at 1865, 18 L.Ed.2d at 1260, are interpreted in *Schwinn's* factual context, it is clear to us that "territory" and "areas" refer to the location of vendees, rather than vendors. Moreover, there are very clear and substantial differences between the effect of the restrictions in *Schwinn* and the effect of those of Sylvania. In *Schwinn* a wholesale distributor was foreclosed from selling Schwinn products to any purchaser located outside his exclusive territory; thus, intrabrand competition (i. e., competition between sellers of the same brand) was wholly destroyed. A potential purchaser of Schwinn products at the wholesale level could look to only one source of the product—the authorized deal-

er for his territory. No other wholesaler could compete by offering a lower price or better service to the same purchaser. In marked contrast, Sylvania franchised at least two dealers in the major markets and each Sylvania dealer was *free to sell to any buyer he chose*—preserving intrabrand competition and allowing to every potential purchaser of Sylvania products a reasonable choice between several competing dealers.

Concurring in *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963),[16] Mr. Justice Brennan noted that while there are no possible procompetitive benefits to be derived from vendee, or customer, restrictions, some territorial restrictions on vendors may have procompetitive effects. The Justice wrote:

"There are other situations, not presented directly by this case, in which the possibility of justification cautions against a too hasty conclusion that territorial limitations are invariably unlawful. Arguments have been suggested against that conclusion, for example, in the case of a manufacturer starting out in business or marketing a new and risky product; the suggestion is that such a manufacturer may find it essential, simply in order to acquire and retain outlets, to guarantee his distributors some degree of territorial insulation as well as exclusive franchises. It has also been suggested that it may reasonably appear necessary for a manufacturer to subdivide his sales territory in order to ensure that his product will be adequately advertised, promoted, and serviced."

372 U.S. at 269, 83 S.Ct. at 705, 9 L.Ed.2d at 750.

"I turn next to the customer restrictions. These present a problem quite distinct from that of the territorial limitations. The customer restraints would seem inherently the more dangerous of the two, for they serve to suppress all

---

**16.** *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), involved customer restrictions that precluded distributors and dealers from selling trucks to any

federal or state government or subdivision thereof and to other large customers without the permission of the manufacturer.

competition between manufacturer and distributors for the custom of the most desirable accounts. At the same time they seem to lack any of the countervailing tendencies to foster competition between brands which may accompany the territorial limitations. In short, there is far more difficulty in supposing that such customer restrictions can be justified." 372 U.S. at 272, 83 S.Ct. at 707, 9 L.Ed.2d at 752.

The observations of Mr. Justice Brennan also spotlight another significant distinction between our case and *Schwinn*. Schwinn had an extremely large share of the bicycle market. Sylvania's market share, however, was so small when it adopted its locations practice that it was threatened with expulsion from the television market. In *Schwinn* a manufacturer with a dominant market share imposed restraints which destroyed any possibility of intrabrand competition in the same territory. Here, a manufacturer with a precarious market share entered agreements which enabled it to achieve a viable 5% market share while preserving significant intrabrand competition in each metropolitan area. When viewed in their respective factual contexts, we cannot possibly perceive the situation presented in the two cases as being analogous or similar, even remotely.

The facts in *Schwinn* make it clear that the territorial restraint which the Court condemned was a restraint that absolutely prohibited a dealer from selling to purchasers outside a certain area. That, of course, is not our case. The *Schwinn* holding that restrictions forbidding dealers from selling to persons located outside specifically designated exclusive territories and to certain classes of customers are *per se* violations of the Sherman Act should not, we think, be stretched to encompass Sylvania's practice which can produce pro-competitive effects, desirable effects wholly different from those produced by the restrictions that the Court, in *Schwinn*, sought to prohibit.

Our interpretation of *Schwinn* is reinforced by the fact that the decree on remand in *Schwinn* expressly sanctions locations clauses. After paraphrasing the general language of the Supreme Court's *Schwinn* decision dealing with restrictions on "areas or persons," the District Court's decree on remand adds: "Notwithstanding the foregoing provisions, nothing in this Final Judgment shall prevent Schwinn . . . from designating in its retailer franchise agreements *the location of the place or places of business for which the franchise is issued.*" *United States v. Arnold, Schwinn & Co.*, 291 F.Supp. 564, 565–66 (N.D.Ill.1968) (Emphasis added). Surely, if a manufacturer has the right to choose a particular dealer to franchise, as the Supreme Court recognized in *Schwinn*, 388 U.S. at 376, 87 S.Ct. at 1864, 18 L.Ed.2d at 1258,[17] and the right to designate the location where the franchise is valid, as recognized in the *Schwinn* decree on remand, then the manufacturer must have the pow-

---

17. One exceptionally distinguished commentator, very recently the Assistant Attorney General heading the Antitrust Division of the Department of Justice and now a United States District Judge, has interpreted *Schwinn* as clearly exempting locations clauses from the rule of *per se* illegality because a locations clause is implicit in this right of a manufacturer to select his dealers:

"Justice Fortas' opinion *does* clearly exempt two types of arrangements. First, it upholds the right of a manufacturer to select—or 'franchise'—the dealers 'to whom, alone, he will sell his goods'—citing *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)—where competitive products are readily available. A necessary element of the right to 'franchise'

—which I suggest is really a word of art covering the Category 2 arrangement described earlier—is the right to have a 'location clause.' That is, a manufacturer must be free to appoint another to be his dealer at a given place and to agree not to appoint another dealer within a certain distance. If this were not so, a manufacturer would exhaust his right of dealer selection—which Justice Fortas says he has—once he appointed a single dealer. Moreover, the auto dealer location clause—allowed to stand in the *General Motors Discount House* case—would be outlawed *sub silentio.*"

McLaren, *Territorial and Customer Restrictions, Consignments, Suggested Retail Prices and Refusals to Deal*, 37 Antitrust L.J. 137, 144–45 (1968) (footnote omitted).

er to enforce these rights if a franchisee violates his location clause agreement.

■ When we move beyond *Schwinn* to a consideration of other relevant precedent,[18]

18. The conclusion we reach is not inconsistent with the recent decision of the United States Court of Appeals for the Fifth Circuit in *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934 (5th Cir. 1975). Two fundamental distinctions between *Coors* and the present case make the reasoning of *Coors* inapplicable to our situation: (1) *Coors* involved overt price fixing, a clear *per se* violation of section one of the Sherman Act. As Judge Gee pointed out in his concurring opinion (506 F.2d at 955), any consideration of *Schwinn* was unnecessary to the decision in *Coors*. (2) The restrictions involved in *Coors* were, like those in *Schwinn*, designed to foreclose all intrabrand competition, while Sylvania's "elbow room policy" undeniably retained and fostered substantial intrabrand competition.

In *Coors*, the plaintiff alleged that Coors combined or conspired with its distributors to fix the retail price of its beer and caused its distributors, servicing the plaintiff's retail liquor store, to discontinue the supply of Coors beer to the plaintiff when he sold below the suggested retail price and declined to give assurances that he would not continue to do so in the future. 506 F.2d at 936. Vertical price fixing, of course, has long been recognized as a *per se* violation of the Sherman Act. *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). There being evidence that Coors had conspired to fix prices, we agree with Judge Gee that it was unnecessary for the court to rely upon *Schwinn* so as to hold that Coors' practices were a *per se* antitrust violation. But of more significance is the fact that the *Coors* opinion explicitly recites that the evidence of price fixing was the foundation for the determination that Coors' restrictions ran afoul of the *Schwinn* holding:

"We do not say that vertically imposed territorial restrictions may never comport with the Sherman Act; *Schwinn* itself conceded they might be proper in the case of new entrants in a highly competitive field or 'failing companies'. *And there may be other exceptions.* We say only that this record does not, as a matter of law, provide justification for excepting Coors from the effect of *Schwinn*, in light of the price fixing evidence." 506 F.2d at 945 (Emphasis in original).

Later in the *Coors* opinion the court abandoned an inquiry into various exceptions which the Tenth Circuit has engrafted onto the *Schwinn* rule, saying:

"But we need pursue the question no further here. Coors's restraints were ancillary to an illegal price fixing scheme." 506 F.2d at 947–48.

our conclusion is further strengthened. We have discovered no reported cases wherein a location clause has been struck down for illegality. In fact, and to the contrary, it

We therefore believe that there is no significant similarity between our situation and that presented in *Coors*. In *Coors* territorial restraints were utilized to effect vertical price fixing—a clear *per se* violation by whatever means it is achieved. Here, there was absolutely no evidence that Sylvania engaged in price fixing or that there was any other unlawful purpose underlying the location clause agreements.

The second major distinction between *Coors* and the present case inheres in the competitive effects of the challenged territorial agreements. In addition to his claim of price fixing, the plaintiff in *Coors* contended that "Coors conspired or combined with its distributors to create and enforce exclusive territories within which each distributor was to conduct his business, *making it impossible for the plaintiff to obtain a supply of Coors beer from another distributor* once his original supply had been cut off." 506 F.2d at 936 (Emphasis added). Mr. Coors himself stated that "unless the distributor could be assured that he would not be confronted with competition from another Coors distributor within his territory—*assured there would be no intrabrand competition* —the distributor would be unwilling to make the necessary capital expenditure, and lending institutions would be unwilling to extend credit to him." 506 F.2d at 938 (Emphasis added).

In contrast to the *Coors* restrictions which "assured that there would be no intrabrand competition" because the distributor promised to "conduct his wholesale distribution exclusively within the prescribed territory" (506 F.2d at 938), Sylvania permitted intrabrand competition. No Sylvania retailer was forbidden to sell to persons residing outside any prescribed territory, and Sylvania franchised more than one dealer in every major metropolitan area in Northern California. It was *not* impossible for a buyer to purchase from more than one seller, as it was for the plaintiff in *Coors*. Thus, the restriction in *Coors*, like the restriction in *Schwinn* and *unlike* Sylvania's location clauses, "assured that there would be no intrabrand competition."

Similar considerations apply to the Tenth Circuit's decision in *Adolph Coors Company v. FTC*, 497 F.2d 1178 (10th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). We need not speculate as to how that decision might relate to locations clauses, since the Tenth Circuit expressly considered the legality of locations clauses in the later case of *Salco Corp. v. General Motors Corp.*, (discussed at p. 23, *infra* ) and resolved the issue as we resolve it now.

has been widely assumed that location restrictions were reasonable restraints of trade, and therefore lawful,[19] ever since *Boro Hall Corp. v. General Motors Corp.*, 124 F.2d 822 (2d Cir. 1942), *cert. denied*, 317 U.S. 695, 63 S.Ct. 436, 87 L.Ed. 556 (1943). In *Boro Hall*, Judge Augustus Hand, writing for the Court of Appeals for the Second Circuit, specifically held that a dealer contract clause that would "fix a location for the sale of used cars at a place that did not unduly affect other dealers" did not constitute an unreasonable restraint of trade. 124 F.2d at 823. In *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), the Supreme Court was presented with a location clause which prohibited Chevrolet dealers from moving to, or establishing, a new location for the sale of Chevrolet vehicles without the prior approval of Chevrolet. The Government urged the Supreme Court to declare the clause illegal, but only insofar as it was employed to prohibit dealers from selling to discounters for resale. The Supreme Court expressly declined to do this,[20] although it held the conduct of General Motors and its dealers unlawful solely on the basis of a horizontal conspiracy among dealers to prevent sales to discounters. In concurring Mr. Justice Harlan wrote, "In my opinion, . . . General Motors is not precluded from enforcing the location clause by unilateral action, and I find nothing in the Court's opinion to the contrary." *Id.* at 149, 86 S.Ct. at 1332, 16 L.Ed.2d at 428. In our own Circuit, the District Court on remand expressly provided that "[n]either the injunctive provisions of this Final Judgment nor any provision thereof shall be construed to enjoin General Motors from acting unilaterally under any Chevrolet dealer franchise agreement or from unilaterally enforcing any such agreement [including the location clause]," except as provided in a six months prohibition relating to sales to discounters.[21] *United States v. General Mo-*

19. *See* Robinson, *Recent Antitrust Developments—1974*, 75 Colum.L.Rev. 243, 276 n.207 (1975).

20. "We need not reach these questions concerning the meaning, effect, or validity of the 'location clause' or of any other provision in the Dealer Selling Agreement, and we do not. We do not decide whether the 'location clause' may be construed to prohibit a dealer, party to it, from selling through discounters, or whether General Motors could by unilateral action enforce the clause, so construed." *United States v. General Motors Corp.*, 384 U.S. 127, 139–40, 86 S.Ct. 1321, 1327, 16 L.Ed.2d 415, 423 (1966).

21. Another case, *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), dealt similarly with locations clauses. Although *Topco* involved horizontal rather than vertical limitations, the District Court, on remand, expressly allowed the defendant to fix the locations of his licensees, except where doing so would give an exclusive territory to another licensee. The District Court's Judgment provided:

". . . nothing in this Final Judgment shall prevent defendant . . . (2) from designating the location of the place or places of business for which a trademark license is issued, provided that the defendant shall not refuse to grant a trademark license to any member or withdraw a license from any member, except any withdrawal incidental to the bona fide termination of any member firm's membership in Topco, *if such action would achieve or maintain territorial exclusivity in any member firm.*" *United States v. Topco Associates, Inc.*, 1973 Trade Cas. ¶ 74,391 (N.D.Ill.1973).

An appeal was taken from the judgment entered by the District Court, after remand, and this judgment was summarily affirmed, with only Mr. Justice Douglas dissenting. 414 U.S. 801, 94 S.Ct. 116, 38 L.Ed.2d 39 (1973).

The dissenting opinions written by my brothers Browning and Kilkenny rely heavily upon language from the Supreme Court's opinion in *Topco* for the sweeping and unqualified conclusion that, in Judge Kilkenny's words, "restricted intrabrand competition cannot be justified by alleged interbrand competitive gain." The majority believes that such a broad interpretation of *Topco* is plainly wrong. In *Topco* the Court held that the District Court had erred by applying a rule of reason to a horizontal restraint, which, the Court noted, is "[o]ne of the classic examples of a *per se* violation of § 1." 405 U.S. at 608, 92 S.Ct. at 1133, 31 L.Ed.2d at 526.

Thus, *Topco* stands only for the accepted proposition that a rule of reason may not be applied in circumstances wherein a *per se* violation has been clearly established. A vertical device, like the locations clause employed in the present case, is by no means a "classic example" of a *per se* violation. When, as here, the issue of *per se* liability has not been previously determined, *Topco* in no way precludes consideration of whatever gains in interbrand

*tors Corporation*, Civil No. 62–1208–CC (S.D.Cal. Aug. 17, 1966).[22]

Two other Courts of Appeals have considered the legality of location clauses in the post-*Schwinn* era, and both have concluded that such clauses are valid. In *Salco Corporation v. General Motors Corporation, Buick Motor Division*, 517 F.2d 567 (10th Cir. 1975), a franchisee, relying upon *Schwinn* contended that the location clause within the standard Buick Automobile dealer franchise agreement [23] was illegal *per se*, as a restraint of trade. The Tenth Circuit rejected this argument, noting with approval the Second Circuit's conclusion in *Boro Hall, supra*, that the right to franchise necessarily validated the type of location clause typically included in automobile franchise agreements. The court therefore concluded that a location clause is valid as a matter of law.

"There is nothing in the complaint, nor for that matter in the facts subsequently developed by Denver Buick in opposition

competition have resulted from intrabrand restrictions.

**22.** Continental attempts to circumvent the precedent established by the *Schwinn, Topco,* and *General Motors* (*United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966)) orders on remand by arguing that the manufacturer's acknowledged right to "franchise by location" means only that a franchisor may authorize a dealer to hold himself out as the "authorized agent" of the franchisor only at certain locations. Thus, the argument continues, the right to "franchise by location" does not give the franchisor any right to prevent the franchisee from opening as many additional outlets as he wishes at unauthorized locations, and the franchisor must provide additional quantities of product and related services to the dealer at these locations. The "right to franchise by location" is construed to mean only that the franchisor may deny his franchisee the right to "hold himself out as the authorized agent" of the manufacturer at these additional locations.

We find the foregoing argument to be highly artificial and even spurious. The very fact that the television sets sold from the unauthorized location bear the Sylvania brand name implies to the public that the store is an "authorized Sylvania dealer", even if the store cannot expressly identify itself as such. The franchised Sylvania dealer has the advantage of company arranged credit, guaranteed company shipments, Sylvania's national advertising of the product, and his recognized name as a Sylvania dealer at his authorized locations. Any inherent advantages of being a Sylvania franchisee go with the dealer to the new location, regardless of whether he holds himself out at the new location as a franchised Sylvania dealer or not. The decree on remand in *Schwinn* expressly provided that nothing therein should prevent Schwinn "from designating in its franchise agreements the location of the place or places of business for which the franchise is issued" 291 F.Supp. 564, 566 (N.D.Ill.1968). Continental would define "franchise", as applied to the facts here, to mean the right of a store at an unauthorized location to refer to itself in its advertisements or signs on the premises as an "authorized Sylvania dealer." It is obvious to us that the word, "franchise", should more logically be interpreted to mean the right to purchase television sets from Sylvania for resale, in conjunction with the above mentioned benefits; in essence, the right to act as a Sylvania dealer. Both the Schwinn and Sylvania franchises were agreements which authorized the dealer to sell the manufacturer's products from a specific location. The primary purpose of the franchises in both cases was to authorize the sale and display of the manufacturer's product, as part of an overall system of distribution.

Therefore, we read the above quoted language from the *Schwinn* decree on remand explicitly to authorize the practice followed by Sylvania, designating the location or locations from which a particular retailer was authorized to operate as the manufacturer's dealer. The term "franchise" in the *Schwinn* order on remand has been similarly interpreted by law review commentators. *See, e. g.,* Pollack, *Alternative Distribution Methods After Schwinn,* 63 Nw.U.L.Rev. 595, 603–04 (1968):

"Nor does the *Schwinn* doctrine outlaw the use of the so-called 'location clause', which designates the location of the place of business for which a franchise is issued and which requires the franchisor's consent to operate the business at another location. . . . Indeed, without some such agreement, it is difficult to see how a franchise relationship could operate. . . . Subsequently in his final decree in the *Schwinn* case on remand from the Supreme Court, Judge Perry specifically authorized Schwinn's use of location clauses in its franchise agreements."

**23.** The location clause involved in *Salco* provided:

"Once dealer is established in facilities and at a location . . . mutually satisfactory to Dealer and Buick, Dealer will not move to or establish a new or different location . . . without prior written approval of Buick." 517 F.2d at 575 n.7.

to the General Motors' summary judgment motion on the First Claim for Relief, indicating that General Motors did anything other than simply assert its rights under the terms of the clause by insisting on the right to approve a new location for Denver Buick. There is no allegation that General Motors assigned territories outside of which dealers could not sell, and in fact the appellant admits otherwise (Br. 57). Accordingly, the Section 1 allegations were properly dismissed, since the location clause is valid as a matter of law, and there are no allegations that would amount to an unlawful use of the clause."

517 F.2d at 576.

In the present case, like *Salco* and unlike *Schwinn*, Sylvania did not assign discrete selling territories outside of which the dealers were not permitted to sell. The dealer could sell to anyone who came to his approved location. Indeed, in terms of the wording of the location clause involved and its potential competitive effect, we find *Salco* to be virtually indistinguishable from the case before us.

In *Kaiser v. General Motors Corp.*, 530 F.2d 964 (3d Cir. 1976), aff'g 396 F.Supp. 33 (E.D.Pa.1975), the Third Circuit affirmed a District Court's order granting summary judgment in favor of a manufacturer against a challenge that a location clause in its franchise agreement was illegal under the Sherman Act. The District Court expressly found nothing in *Schwinn* that makes location clauses illegal.

Looking beyond the cases dealing with location clauses, we find numerous decisions that, while applying *Schwinn*, have not interpreted *Schwinn* as establishing a *per se* rule against all vertical territorial restraints.[24] A variety of vertical territorial and customer restraints have been upheld under the rule of reason test,[25] and some of

24. The tendency of the courts to construe the *Schwinn* holding narrowly has been the subject of law review discussions. *See* Note, *Territorial and Customer Restrictions: A Trend Toward a Broader Rule of Reason?*, 40 Geo.Wash.L. Rev. 123 (1971); Note, *Vertical Territorial and Customer Restrictions Under the Sherman Act: Decisions Since United States v. Arnold, Schwinn & Co.*, 22 J.Pub.L. 483 (1973).

25. While a locations clause is a common tool utilized by manufacturers in their distributorship or franchise arrangements, it is by no means the only vertical restraint that has been employed to subject a distributor or retailer of products bearing a recognized trade name to certain controls over his business operations. These other controls on dealer territorial expansion include such practices as exclusive dealerships, area of primary responsibility covenants, and profit pass-over requirements. Each of these vertical restraints might limit intrabrand competition, and all are susceptible, linguistically, to inclusion within the literal language of *Schwinn*; nevertheless, all have been upheld against claims that they fall within *Schwinn's per se* rule of prohibition. *See Colorado Pump & Supply Co. v. Febco Inc.*, 472 F.2d 637 (10th Cir.), *cert. denied*, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973) (primary responsibility clause); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (exclusive dealership); *Superior Bedding Co. v. Serta Associates, Inc.*, 353 F.Supp. 1143 (N.D. Ill.1972) (primary responsibility and profit pass-over clauses); *Plastic Packaging Materials, Inc. v. Dow Chemical Co.*, 327 F.Supp. 213 (E.D.Pa.1971) (primary responsibility clause); *but cf. Reed Brothers, Inc. v. Monsanto Company*, 525 F.2d 486 (8th Cir., 1975) (recognizing that courts have approved designation of areas of primary responsibility "without more", but holding that there was "more" in Monsanto's additional policies that effectively curtailed the ability of its distributors to sell Monsanto Herbicides, after purchase, to whomever they wished).

A primary responsibility clause is basically an agreement obligating a distributor to concentrate his sole efforts in a specified geographical area for which he is primarily responsible. The use of these clauses was endorsed in *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), by Mr. Justice Brennan, who noted in his concurring opinion that the lawfulness of area of primary responsibility covenants has been recognized in many consent decrees. (372 U.S. at 271 n. 12, 83 S.Ct. at 706, 9 L.Ed.2d at 751).

A profit pass-over arrangement requires a dealer who makes sales within the territory of another dealer to turn over part of his profits from those sales to that other dealer, to compensate the other dealer for the latter's promotional efforts in the territory wherein the sale occurred. Mr. Justice Brennan also discussed this type of restriction in *White Motor Co., supra*, noting "[i]f, for example, such a cross-sale incurs only an obligation to share (or 'pass over') the profit with the dealer whose territory has been invaded—as is most often, and appar-

these restraints were far more burdensome than the location clause which is here at issue. *See Anderson v. American Automobile Association,* 454 F.2d 1240, 1246 (9th Cir. 1972); *Tripoli Company, Inc. v. Wella Corp.,* 425 F.2d 932, 936 (3d Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); [26] *Janel Sales Corp. v. Lanvin Parfums, Inc.,* 396 F.2d 398, 406 (2d Cir.), *cert. denied,* 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968); *Carter-Wallace, Inc. v. United States,* 449 F.2d 1374, 1380, 196 Ct.Cl. 35 (1971); *National Dairy Products Corp. v. Milk Drivers & Dairy Employees Union Local 680,* 308 F.Supp. 982 (S.D.N.Y. 1970); *La Fortune v. Ebie,* 1972 Trade Cas. ¶ 74,090 (Calif.Ct.App.). *See also Good Investment Promotions, Inc. v. Corning Glass Works,* 493 F.2d 891 (6th Cir. 1974).

In the light of the cases upholding the legality of location clauses and the fact that the decree on remand in *Schwinn* expressly permitted manufacturers to designate the location for which a franchise is issued, it is hardly surprising that *Schwinn* has been interpreted by learned commentators as leaving undisturbed the basic legality of

location clauses.[27] Moreover, years after *Schwinn,* the Department of Justice refused to characterize location clauses as illegal *per se,* treating them instead as restrictions to be governed by the rule of reason.[28] And only last year, a spokesman for the Antitrust Division stated that locations clauses "are not illegal standing by themselves" since "[t]hey reflect the manufacturer's legitimate interest in having his goods distributed efficiently throughout a particular area." Address by K. Clearwaters before the International Franchising Association, *Franchising and the Antitrust Laws,* May 16, 1974. The Federal Trade Commission has also recognized that *Schwinn* did not establish a *per se* rule against vertical territorial restrictions. In its Report of the Ad Hoc Committee on Franchising, the Commission reached the conclusion that:

"... in *Schwinn,* the Court left enough leeway in its initial threshold test of the overall reasonableness of vertical arrangements to enable a manufacturer to justify such an arrangement by establishing that it could not have entered the market or expanded its market share ...."

More recently, the Third Circuit has suggested that the principle established in *Tripoli* may not be limited to health and safety justifications, but may extend to encompass the broader proposition that "... where a manufacturer's restriction is related to a legitimate business purpose, Schwinn may be inapplicable." *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 847 n.13 (3rd Cir. 1974).

---

ently here, the case—then the practical effect upon competition of a territorial limitation may be no more harmful than that of the typical exclusive franchise—the lawfulness of which the Government does not dispute here." 372 U.S. 253, 270–71, 83 S.Ct. 696, 706, 9 L.Ed.2d 738, 751 (Brennan, J., concurring).

**26.** The Third Circuit, sitting *en banc,* held in *Tripoli* that a cosmetic manufacturer's restriction on its distributor's resale of products, intended for professional use, to non-professionals was not a *per se* violation of the Sherman Act, although the challenged practice fell within the *Schwinn* language pertaining to restrictions on resale after title to the product passes to the distributor. The court applied the rule of reason and held the restrictions reasonable as a means of protecting the public from potential harm. The court chose to restrict *Schwinn* to its facts, stating:

"That case [*Schwinn*] does not, as plaintiff proposes, establish as a per se violation every attempt by a manufacturer to restrict the persons to whom a wholesaler may resell any product whatsoever, title to which has left the manufacturer. Rather, *Schwinn* must be read, as must all antitrust cases, in its factual context." 425 F.2d at 936 (3rd Cir. 1970).

**27.** *See* Jentes, *Permissible Vertical Restraints in Manufacturer-Distributor Relations,* 8 A.B.A. Antitrust Law Notes 97, 102 (Summer 1972), in which the author advises that a location clause is not only legal, but a *preferred* type of manufacturer restraint under *Schwinn. See also 1968 Antitrust Law Symposium of the New York State Bar Association,* 62–64; Pollack, *Alternative Distribution Methods After Schwinn,* 63 Nw.U.L.Rev. 595, 603–4 (1968); Hanson, *American Bar Association Symposium on Marketing and Franchising: Antitrust Prognosis for the 70's,* 39 Antitrust L.J. 502, 516 (1970).

**28.** *See* Robinson, *Recent Antitrust Developments—1974,* 75 Colum.L.Rev. 243, 276 n.207 (1975).

FTC, Report of the Ad Hoc Committee on Franchising 30 (June 2, 1969). *See, Coca Cola Co.*, 3 CCH Trade Reg.Rep. ¶ 21,010 (Oct. 8, 1975) (Sustaining a soft drink manufacturer's imposition of exclusive territories upon licensed bottlers).

In summary, when *Schwinn* is analyzed in its factual context it is readily distinguishable from the case before us, in terms of both the kind of restrictions involved and their operative competitive effect. This conclusion is reinforced by reference to the *Schwinn* decree on remand, *Boro Hall, Salco,* and *Kaiser,* all of which uphold location clauses like the one before us now. Finally, in both the cases decided after *Schwinn* involving other types of vertically imposed customer and territorial restraints, and the post-*Schwinn* pronouncements of the Federal Trade Commission and Antitrust Division of the Department of Justice, we see a clear trend against interpreting *Schwinn* as establishing a per se rule of illegality, indiscriminately invalidating all vertical territorial restraints without any consideration of their reasonableness in terms of their overall competitive effect.

B. *The Exclusive Dealership Precedents*

The validity of the trial judge's decision to apply a rule of *per se* illegality to Sylvania's locations practice is further undermined by the many authorities upholding a manufacturer's right to grant "exclusive dealerships," a practice much more restrictive of competition than Sylvania's location clauses. In an exclusive dealership arrangement a manufacturer agrees with a dealer not to authorize any competing dealers to sell the manufacturer's products anywhere within the exclusive territory of the first dealer. There is a veritable avalanche of precedent to the effect that, absent sufficient evidence of monopolization, a manufacturer may legally grant such an exclusive franchise, even if this effects the elimination of another distributor. *See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.,*

459 F.2d 138 (6th Cir. 1972); *Scanlan v. Anheuser Busch, Inc.,* 388 F.2d 918 (9th Cir. 1968), *cert. denied,* 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968); *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1, 7 (9th Cir. 1963), *cert. denied,* 385 U.S. 976, 87 S.Ct. 507, 17 L.Ed.2d 438 (1966); *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); *Packard Motor Car Co. v. Webster Motor Car Co.,* 100 U.S.App.D.C. 161, 243 F.2d 418 (D.C. Cir.), *cert. denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); *Interborough News Co. v. Curtis Publishing Company,* 225 F.2d 289 (2d Cir. 1955); *Naifeh v. Ronson Art Metal Works,* 218 F.2d 202 (10th Cir. 1954); *Bascom Launder Corp. v. Telecoin Corp.,* 204 F.2d 331 (2d Cir.), *cert. denied,* 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401 (1953); *Fargo Glass & Paint Co. v. Globe American Corp.,* 201 F.2d 534 (7th Cir.), *cert. denied,* 345 U.S. 942, 73 S.Ct. 833, 97 L.Ed. 1368 (1953); *Potter's Photographic Applications Co. v. Ealing Corp.,* 292 F.Supp. 92 (E.D.N.Y.1968); *L. S. Good & Co. v. H. Daroff & Sons, Inc.,* 279 F.Supp. 925 (N.D.W.Va.1968); *Peerless Dental Supply Co. v. Weber Dental Manufacturing Co.,* 283 F.Supp. 288 (E.D.Pa.1968); *Top-All Varieties, Inc. v. Hallmark Cards, Inc.,* 1969 Trade Cas. ¶ 72,850 (S.D.N.Y.). *See generally* Note, *Restricted Channels of Distribution Under the Sherman Act,* 75 Harv.L. Rev. 795 (1962).

The clearly established legality of exclusive dealerships logically compels the conclusion that location clauses cannot be *per se* illegal. If it is legal for a manufacturer to promise one dealer that he will have the exclusive right to sell the manufacturer's products within a designated territory, then obviously it is legal for that manufacturer to keep his promise of exclusivity by denying other dealers like Continental the power to sell from retail outlets at unauthorized locations within the first dealer's exclusive territory. The accepted principle that a manufacturer may legally grant an exclusive dealership is rendered meaningless if he cannot legally use a location clause to prevent his other dealers from opening

**998**

their own retail outlets in the same area. If a manufacturer cannot include a location restriction in a franchise agreement, he cannot do what the exclusive dealership cases hold is legal, i. e., promise that "I will not franchise another dealer in your area." If a location restriction cannot legally be enforced, and, for example, a franchisee is established in San Francisco, California, who then opens a store in Los Angeles, California, the manufacturer cannot fulfill his promise to his original Los Angeles franchisee that he will not recognize another dealer in Los Angeles. Therefore, we conclude that the rule of *per se* illegality applied below is logically inconsistent and irreconcilable with our decision in *Hawaiian Oke* and the many other cases upholding the right of manufacturers to establish exclusive dealerships.

■ If the rule adopted by the trial judge in this case were the law, it would have grievous implications for the common and established practices of franchising [29] and the granting of exclusive dealerships. Under the district judge's approach a manufacturer legally prevented from imposing or enforcing a location restriction could not lawfully prevent its franchisee from creating new outlets at any unauthorized locations the franchisee might choose and distributing the franchisor's merchandise therefrom. In other words, under the rule of *per se* illegality, *if a dealer is franchised anywhere he is franchised everywhere.* Once the manufacturer has granted a franchise for any location, he would be legally obligated to enable the franchisee to sell the manufacturer's product from all other locations into which the franchisee might wish to expand, regardless of the prejudicial effect that this would have on existing distribution in those areas.[30]

**29.** According to the Department of Commerce, there were 445,281 franchised businesses in the United States in 1972. U.S. Dept. of Commerce, Franchising in the Economy 1972–1974 (1974).

**30.** It has been argued that if, under *Schwinn,* Sylvania could not legally prevent Continental from selling to another unfranchised retailer, who thereupon resells from an unauthorized location, then there is no reason why Continental could not sell to itself (by shipping television sets to unauthorized locations for resale there). It may be true that any attempt by Sylvania to restrict sales by its franchisees to unfranchised dealers would constitute a violation of the antitrust laws. However, Sylvania was careful to avoid this problem by allowing its dealers to sell to anyone. Allowing a franchised dealer to sell to a non-franchised retailer has a far different effect upon the franchisor than allowing a franchisee, in violation of a contract, to open a store at any location he chooses. The unfranchised retailer would ordinarily, in the first instance, pay a higher price for the Sylvania product because the unfranchised dealer would be buying through a middleman, the franchised dealer, rather than directly from Sylvania. On the other hand, as we have previously emphasized, the franchised dealer has the benefit of company arranged credit, guaranteed company shipments, and a recognized name as a Sylvania franchisee, as well as the advantage of buying directly from the manufacturer at a lower price. And all advantages of the status of a Sylvania franchisee attend the dealer's move to the new location, regardless of whether he holds himself out at the new location as a franchised Sylvania dealer. The franchised dealer who violates the company's elbow room policy still will retain all the benefits of his franchise, while eliminating the benefits to the company of having a reliable market, and spaced distribution. The ultimate economic result of the approach below would likely spell the doom of all Sylvania franchised dealers. No longer could Sylvania offer to its dealers the primary advantage of a promise not to franchise more dealers than a particular market could reasonably support. This promise on Sylvania's part was not nearly as restrictive as an exclusive dealership, which our court and many others have upheld, but it did tend to prevent the kind of "cut-throat" competition between franchisees that could ultimately result in the destruction of Sylvania as an interbrand competitor. The elbow room policy was never used by Sylvania severely to restrict intrabrand competition or to divide markets. No dealer had a veto power over the entry of other dealers into his area, and locations were authorized by Sylvania solely on the basis of market expandability.

Taking another approach, Continental also argues that "Continental sold in Sacramento not 'to itself', but to an 'unfranchised dealer', namely, to S.A.M. Industries, Inc." In fact, the record thoroughly belies this contention and conclusively demonstrates that Continental was indeed shipping to itself in Sacramento because S.A.M. Industries, Inc., was not a separate, independent dealer.

The adoption of the rule of *per se* illegality in a case such as this would undoubtedly hasten the disappearance from the American market place of the small independent merchant, now often a franchisee, and already an endangered entrepreneur. The Supreme Court has recognized the concern that Congress has expressed over the disappearance of the small independent merchant due to competition with much larger, vertically integrated firms. In the words of Mr. Justice Stewart,

"... franchising promises to provide the independent merchant with the means to become an efficient and effective competitor of large integrated firms. Through various forms of franchising, the manufacturer is assured qualified and effective outlets for his products, and the franchisee enjoys backing in the form of know-how and financial assistance. These franchise arrangements also make significant social and economic contributions of importance to the whole society, as at least one federal court has noted:

'The franchise method of operation has the advantage, from the standpoint of our American system of competitive economy, of enabling numerous groups of individuals with small capital to become entrepreneurs. . . . If our economy had not developed that system of operation these individuals would have turned out to have been merely employees. The franchise system creates a class of independent businessmen; it provides the public with an opportunity to get a uniform product at numerous points of sale from small

independent contractors, rather than from employees of a vast chain.' [31]

Indiscriminate invalidation of franchising arrangements would eliminate their creative contributions to competition and force 'suppliers to abandon franchising and integrate forward to the detriment of small business. In other words, we may inadvertently compel concentration by misguided zealousness. As a result, '[t]here [would be] less and less place for the independent.' *Standard Oil Co. v. United States*, 337 U.S. 293, 315, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371, 1386 (separate opinion of Mr. Justice Douglas). 'The small, independent businessman [would] be supplanted by clerks.' *Id.*, at 321, 69 S.Ct. at 1067 [93 L.Ed. at 1386]."

*United States v. Arnold, Schwinn & Co.*, 388 U.S. at 386–87, 87 S.Ct. at 1869, 18 L.Ed.2d at 1264–65 (Stewart, J., concurring and dissenting) (footnotes omitted).

If we were to adopt the approach of *per se* illegality, the ultimate result might be to undermine franchising as a tool to enable the small, independent businessman to compete with the large vertically integrated giants of many industries. One danger would be that a single franchisee, allowed to expand into a chain of stores and sell everywhere over the manufacturer's objection and in violation of the contract, might make it impossible for other small single-outlet franchisees of the same manufacturer to compete effectively. Thus the loyal network of small independent businessmen that the manufacturer desired for his franchisees might be supplanted by several "gi-

---

In the original Answer and Counterclaim, Continental (including S.A.M.) alleges that it, as a group of affiliates, did business in California under the firm name and style of "Continental T.V." Throughout its Answer S.A.M. and the other affiliated corporations referred to themselves, collectively, as "Continental." In his statements to the jury, Continental's attorney made it clear that S.A.M. was a part of Continental and that the Sacramento store operated by S.A.M. was doomed to be a link in the Continental chain. The testimony of George Shahood, the President and General Manager of Continental T.V., also shows that the Sacramento store was part of Continental T.V.'s whole enterprise. Finally, and as the

irrefutable answer to Continental's alternate approach, the district judge found as a fact that "Cross claimants are a group of affiliated corporations in substantially common ownership which did business under the name 'Continental T.V.' George Shahood and his wife were the principal owners of all the corporations and Mr. Shahood was the principal operating officer."

31. Quoting *Susser v. Carvel Corp.*, 206 F.Supp. 636, 640 (S.D.N.Y.1962), *aff'd*, 332 F.2d 505 (2d Cir. 1964), *cert. granted*, 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91, *cert. dismissed*, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).

ant" franchisees, each having numerous outlets. Another risk would be that a small manufacturer who could not afford to integrate vertically, if prohibited from offering any degree of territorial protection from intrabrand competition or "elbow room", might not be able to attract dealers and thus might be unable to establish an effective system of distribution for its product. We cannot believe that Congress intended to implement a rigid *per se* rule of illegality that portends such serious risk to franchising arrangements, methods that have made significantly worthy contributions to our Nation's economy.[32]

### C. The Policy of the Sherman Act

 A final reason for our conclusion, and perhaps the most compelling one, is our belief that location agreements like the ones adopted by Sylvania may in some instances *promote,* rather than impede, competition. Consequently, we think that there must be a case by case inquiry under the "rule of reason" to determine the competitive effect of such restraints if the policy of the Sherman Act is to be effectuated. The true anticompetitive evil of the restraints which *Schwinn* declared to be illegal *per se* was their total proscription of all competition between *Schwinn* dealers for the same customers or within the same geographical areas. Here, Sylvania's practice involved no such total destruction of intraband competition.[33] Implicit in the application of a *per se* rule in antitrust analysis is the conclusion that the challenged practice neces-

sarily and always involves an unreasonable restraint upon competition,[34] and thus can be conclusively presumed to be illegal without any inquiry into the nature and history of the industry involved and a determination of the precise manner in which a particular restraint has affected competition. Harsh and inflexible *per se* rules should be applied when, and only when, a court has made a threshold examination of the economic effects of the challenged practice and has determined that it is clear that the practice to be declared illegal *per se* has had a "pernicious effect on competition" and a "lack of any redeeming virtue." *See Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958).

On the record before us Continental has not proved that the enforcement by Sylvania of its location clause has worked a net anticompetitive effect, or that the facts presented in this one case warrant the conclusion that further inquiry into the economic impact of Sylvania's location clauses upon competition would be irrelevant. We recognize, of course, that in establishing a locations practice, Sylvania did check intrabrand competition to some extent. This was an inevitable incident to Sylvania's attempt to promote and maintain interbrand competition. However, to ignore Sylvania's ultimate purpose to remain in the market as a viable competitor, thereby fostering interbrand competition, and to consider only the fact that its practice slightly limited intrabrand competition, is to overlook the

---

**32.** *See generally* H. Brown, Franchising—Realities and Remedies (1973); Small Business Administration for Senate Select Committee on Small Business, 92d Cong., 1st Sess., Report on the Economic Effects of Franchising (Comm. Print 1971); E. Lewis & R. Hancock, The Franchise System of Distribution (1963); Zeidman, *The Growth and Importance of Franchising— Its Impact on Small Business,* 12 Antitrust Bull. 1191 (1967).

**33.** *See* text accompanying notes 14 to 18 *supra.*

**34.** "Specifically, the *per se* rule of prohibition has been applied to price-fixing agreements, group boycotts, tying arrangements, and horizontal division of markets. As to each of these

practices, experience and analysis have established the utter lack of justification to excuse its inherent threat to competition. To gauge the appropriateness of a *per se* test for the forms of restraint involved in this case, then, we must determine whether experience warrants, at this stage, a conclusion that inquiry into effect upon competition and economic justification would be similarly irrelevant." *White Motor Co. v. United States,* 372 U.S. 253, 265–66, 83 S.Ct. 696, 703, 9 L.Ed.2d 738, 748 (1963) (Brennan, J., concurring) (footnotes omitted). *See generally* von Kalinowski, *The Per Se Doctrine—An Emerging Philosophy of Antitrust Law,* 11 U.C.L.A.L.Rev. 569 (1964).

forest while watching the trees.[35] The free market policy of the antitrust laws would not be served by fashioning rules which foster intrabrand competition to the point of extinguishing interbrand competition. This would lead to the more insidious evil of total monopolization. In this connection, it is important to emphasize the following considerations: that in a market dominated by a single company (RCA), Sylvania possessed only a minor fraction of the total market, that many other brands were available to the consumer, that Sylvania dealers possessed no veto power against the franchising of additional dealers in any given area, that Sylvania dealers could and did carry competing brands, and that the location restriction on Sylvania dealers had no demonstrable effect on prices, volume of products available, quality, or consumer choice. Additionally, in no market did Sylvania's practice foreclose any consumer from substantial choice among several Sylvania dealers, and any Sylvania dealer who might have been inclined to set his prices too high or to provide inadequate service would run headlong into both strong interbrand competition from other manufacturers and intrabrand competition from one or more other Sylvania dealers.

Where, as here, it cannot be said with certainty that a challenged practice is inherently anticompetitive and unreasonable, the standard commonly referred to as the "rule of reason" is, and should be, applied. That rule, read into the Sherman Act in *Standard Oil Co. v. United States,* 221 U.S. 1, 62, 31 S.Ct. 502, 516, 55 L.Ed. 619, 646

(1911), was stated in its classic form by Mr. Justice Brandeis in *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

*Id.,* at 238, 38 S.Ct. at 244, 62 L.Ed. at 687.

In holding that an instruction incorporating the "rule of reason" should have been given to the jury, we note that Sylvania presented substantial evidence from which the jury might have reasonably concluded that Sylvania's location practice, rather than unreasonably restricting competitive market forces, actually had a procompetitive effect [36] in that it enabled a marginal

---

**35.** As one economist has explained the principal point in the course of an analysis of the economic effects of restrictive distribution arrangements:

"Restrictive marketing arrangements of any sort thus limit competition in some respect. However . . . limitations on competitive activity in one direction *may* strengthen competitive forces in another . . . The question for analysis . . . is whether this departure from competitive structure within one marketing organization is counterbalanced by an increase in the number of marketing organizations and products available in particular markets or in the vigor of competitive behavior." Preston, *Restrictive*

*Distribution Arrangements: Economic Analysis and Public Policy Standards,* 30 Law. & Contemp. Prob. 506, 508 (1965).

**36.** Lee Egan Preston, Jr., a professor at the School of Management at the State University of New York in Buffalo, testified as to his conclusions after a study of the television market:

"A: Now, since Sylvania occupies a relatively small position in the television market and it is therefore a competitive element in that market, I think the television market would be less competitive if Sylvania would be out of it, because the number of brands, after all, are 10 to 12.

producer to achieve the status of a viable competitor in an industry threatened by oligopolistic tendencies. It may be true, as Sylvania claimed, that the location restrictions employed by Sylvania attracted dealers to carry and promote Sylvania's products, and ultimately fortified its market position in competition with other brands. Perhaps some limit on ruinous intrabrand competition was necessary to induce a sufficient number of otherwise reluctant dealers to sell the Sylvania product. It is undisputed that, as we have previously noted, Sylvania's share of the market increased from less than 2% in 1962 to 5% by 1965. Any reduction of intrabrand competition that may have resulted from the locations prac-

tice apparently did not eventuate in the evils that are normally associated with an unreasonable restraint of trade, since the television industry as a whole experienced both an increase in volume and a decrease in price during this period.[36a] Whether some diminution in intrabrand competition is justified when it averts the loss of one competitor in an industry that is already oligopolistic should ultimately be a question for the finder of the facts. Our choice of a rule of reason test over a *per se* rule of illegality means only that the critical policy question will at least be asked and answered.[37] In our view, the Sherman Act demands no less.

> Sylvania is in there. They are at the bottom, but in there.
>
> Now, if we squeeze out the bottom firms from that market, then I think we would see a decline in competition among brands in all the major markets in the country. Therefore, if this distribution policy or any particular distribution policy has the effect of strengthening Sylvania or any other smaller firm as a competitive force among the other firms in that market, many of which are much larger, then I think we have to look carefully at that policy as an element in competition, indeed, as a procompetitive policy among the brands and the manufacturers as a whole.
>
> Q: In the opinion which you have just described for us, sir, did you ascertain whether the type of distribution policy that you have assumed to be employed was in any way beneficial to competition in the sense beyond the one you have just given?
>
> A: I think I just responded to that by saying that I think that anything that maintains a range of competition alternatives throughout the market strengthens competitive forces there."
>
> \* \* \* \* \* \*
>
> "Q: Assuming a distribution practice of the type that you are asked to assume, is there any anticompetitive characteristics that you can identify?
>
> A: I don't see any, because I feel that competition in the market has resulted from the large number of brands and dealers available throughout the system." *Compare* Preston, *supra* note 35, at 506.

**36a.** *See* Note, 53 Texas L.Rev. 127, 136 (1974).

**37.** A number of justifications have been offered for vertically-imposed territorial restraints, a few of which can be briefly summarized. We express no view as to the validity of these justifications, either as a matter of abstract

economic theory or in the context of the specific facts of this case. As previously indicated, under the rule of reason the ultimate question must be answered by the trier of fact.

Perhaps the major justification offered for such restrictions is that they enable a manufacturer to obtain access to markets that are otherwise closed to him. It is altogether probable that distributors will be unwilling to handle a manufacturer's product unless they are afforded some protection against ruinous intrabrand competition. Dealers could justifiably believe that in the absence of vertical restrictions, "cutthroat" intrabrand competition from other dealers would drive down prices and render their operation unprofitable, and endanger their capital investment.

A second argument in favor of vertical restrictions is the so-called "free ride" theory. Vertical restrictions are said to be necessary to prevent dealers from invading the territories of other dealers by choosing to rely on the promotional efforts of those other dealers rather than undertaking costly selling activities themselves. It is argued, with significant logic, that in the absence of vertical territorial restrictions, dealers will not provide advertising or repair facilities as extensively as they would if they could be assured that invading dealers will not pirate the benefits of these promotional activities.

A third asserted justification for vertical restrictions is that they encourage total sales effort on a dealer's part by facilitating more concentrated and intense coverage of each geographic market, thus leading to increased sales of the manufacturer's products. Sales to large customers located close to the dealer usually require lower distribution costs than sales to smaller, more distant customers. Accordingly, the manufacturer benefits if all customers are charged an identical price and the dealer's savings from sales to the choice customers offset the higher costs incurred in sales to others.

Chief Justice Hughes once wrote, in discussing the Sherman Act: "The restrictions the Act imposes are not mechanical or artificial. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness." *Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 360, 53 S.Ct. 471, 474, 77 L.Ed. 825 (1933).[38] In holding that the just result in the present controversy is not absolutely foreordained by *Schwinn,* and that a rule of reason analysis should have been applied, we believe and hope that we further the Sherman Act's goal of protecting the consumer from the dangers that result when free competition is suppressed. Since the legislative intent underlying the Sherman Act had as its goal the promotion of consumer welfare,[39] we decline blindly to condemn a business practice as illegal *per se*

because it imposes a partial, though perhaps reasonable, limitation on intrabrand competition, when there is a significant possibility that its overall effect is to promote competition between brands. If the application of the rule of *per se* illegality in this case were permitted to stand, Sylvania would inevitably be stripped of a tool which it claims enabled it to compete effectively with the few "giants" of the industry. Its market share might well shrink to the precarious level that existed prior to institution of its "elbow room" policy. It is altogether possible that foreclosing the competitive benefits of vertical agreements like the one here involved by means of a *per se* rule, without any inquiry into the possibility of an overall procompetitive effect in the relevant industry, might well signal the death of similarly situated manufacturers with small market shares in other industries.[40] If a *per se* rule

Vertical territorial restrictions are thus often designed to motivate dealers to increase their depth of coverage in narrowly defined areas rather than "skimming" choice customers over a wider area.

A fourth major justification for the legality of vertical restraints is that they are necessary incentives to motivate dealers to provide a high quality and character of dealer services such as consumer credit, prompt and efficient repairs, and other post-sale services. The theory is that dealers can be persuaded, and are willing, to provide these better services in exchange for some insulation from ruinous intrabrand competition.

For a more detailed discussion of these justifications and others, *see* Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division,* 75 Yale L.J. 373, 430–453 (1966); Comanor, *Vertical Territorial and Customer Restrictions: White Motor and its Aftermath,* 81 Harv.L.Rev. 1419, 1426–33 (1968); Preston, *Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards,* 30 Law. & Contemp. Prob. 506, 511–12 (1965).

**38.** In the words of the present Solicitor General of the United States, ". . . the inescapable fact is that an agreement which eliminates competition is basic to almost every productive unit consisting of more than a single person. The agreement may be spelled out or, more often, may be tacit, but, to the degree that coordination of the productive activities of persons is achieved, actual or potential competition must be eliminated." Bork, *supra* n.37 at 377 (1966). For a classic discussion cautioning against an overly literal construction of the

Sherman Act, see the dissenting opinion of Mr. Justice Holmes in *Northern Securities Co. v. United States,* 193 U.S. 197, 400–411, 24 S.Ct. 436, 486–487, 48 L.Ed. 679, 726–730 (1904).

**39.** A study of the legislative history of the Sherman Act "establish[es] conclusively that the legislative intent underlying the Sherman Act was that courts should be guided exclusively by consumer welfare and the economic criteria which that value premise implies." Bork, *Legislative Intent and the Policy of the Sherman Act,* 9 J.Law & Econ. 7, 11 (1966). The current Solicitor General also noted that:

"It is difficult to resist the conclusion that the most faithful judicial reflection of Senator Sherman's and his colleague's policy intentions was the rule of reason enunciated by Chief Justice White in the 1911 *Standard Oil* and *American Tobacco* opinions. There was in White's opinions as in Sherman's speeches the idea that the statute was concerned exclusively with consumer welfare and that this meant the law must discourage restriction of output without hampering efficiency. White appears also to have incorporated into his rule of reason those major rules of law which Sherman envisaged as implied by a consumer-welfare policy. The rules implied by the policy are alterable as economic analysis progresses, however. White clearly foresaw this and incorporated that principle of change into the rule of reason."

*Id.* at 47.

**40.** We acknowledge that, as a matter of economic theory, there is a sharp divergence of opinion as to the alleged procompetitive effects

of illegality is permitted to replace a genuine inquiry into the reasonableness and economic effect of business arrangements which, in reality, strengthen competition and promote the Nation's economic welfare, the purpose of the Sherman Act is undermined. This would promote monopoly, hamstring free enterprise, and victimize our country's consumers. Hopefully, our conclusion in this case bars such subversion of the national welfare.

The judgment of the District Court is reversed, and the cause is remanded for further proceedings not inconsistent with the views herein expressed.[41]

Reversed and Remanded.[42]

KILKENNY, with whom BROWNING, DUNIWAY and WRIGHT, Circuit Judges, concur in whole or in part (dissenting).

With the majority factual statement so fraught with irrelevancies and weighted

---

of vertical territorial restrictions. Perhaps the classic exposition of the competing arguments appear in two discussions, one written by Solicitor General Bork, and the other by William Comanor. *Compare* Bork, *supra* n.37, *with* Comanor, *supra* n.37. We do not further summarize the major aspects of the competing views, inasmuch as our reasoning in the present case endorses neither of the views. We simply believe that the fact that a disagreement exists, and the corresponding possibility that the locations clauses involved here *may* have had a procompetitive effect, renders wholly inappropriate the application of a *per se* rule of illegality. The ultimate consideration of the procompetitive merits of Sylvania's practice must be conducted under the rule of reason.

**41.** Sylvania vigorously contends that even if its locations practice could be held to be illegal *per se* under *Schwinn,* then it should have had the benefit of an instruction on the "failing company" defense. We have hitherto quoted its proffered jury instruction in this respect. *See* note 11 *supra.* Sylvania argues that at the time its "elbow room" policy was instituted, Sylvania would have been compelled to abandon its television manufacturing business if it did not increase its share of the market in the manner that it did. The failing company defense has generally been applied to mergers or acquisitions which would otherwise violate the antitrust laws. *United States v. Greater Buffalo Press,* 402 U.S. 549, 91 S.Ct. 1692, 29 L.Ed.2d 170 (1971); *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); *International Shoe Co. v. FTC,* 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930); Hale and Hale, *Failing Firms and the Merger Provisions of the Antitrust Laws,* 52 Ky.L.J. 597 (1964); Connor, *Section 7 of the Clayton Act: The Failing Company Myth,* 49 Geo.L.J. 84 (1960). However, *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) indicates that the defense is also available in cases wherein a vertical restraint is being challenged. The Court in *Schwinn* clearly indicated its intent that the failing company defense, once shown, would then subject the case to the rule of reason and

the *per se* rule would not be applicable. We requote the Court's remarks:

"We first observe that the facts of this case do not come within the specific illustrations which the Court in *White Motor* articulated as possible factors relevant to a showing that the challenged vertical restraint is sheltered by the rule of reason because it is not anticompetitive. Schwinn was not a newcomer, seeking to break into or stay in the bicycle business. It was not a 'failing company.'" 388 U.S. at 374, 87 S.Ct. at 1863, 18 L.Ed.2d at 1257. However, because we have determined that the trial court erred in applying the *Schwinn* rule of *per se* illegality to Sylvania's locations clauses and that a new trial is therefore required, we find it unnecessary now to decide whether there was sufficient evidence to warrant instructing the jury on the failing company defense. For future guidance to the District Court, however, we think it presently appropriate to emphasize that even if a manufacturer is prosperous in its whole operation, the failing company defense is applicable if the company is failing in the manufacture and distribution of one of its significant products. In *Schwinn* Mr. Justice Fortas wrote of the "product market." 388 U.S. at 382, 87 S.Ct. at 1867, 18 L.Ed.2d at 1262.

Similarly, our determination that the rule of *per se* illegality established in *Schwinn* is inapplicable to the Sylvania location practice challenged here also makes it unnecessary for us to consider the merits of Sylvania's argument that it had no reasonable basis for believing its practices violated the antitrust laws because the conduct in question occurred before the *Schwinn* decision.

**42.** While the disposition of the present case was under consideration by the full court, a panel issued its opinion in *Noble v. McClatchy Newspapers,* 533 F.2d 1081 (9th Cir. 1975).

The majority here has no quarrel with the result reached by the *Noble* court; however, any language in the *Noble* opinion that may be inconsistent with any of the majority's language in the present case is hereby disapproved.

with factual issues decided adversely to appellant by the jury,[1] it is our firm belief that a separate statement would be helpful to a full understanding of the principal issue presented. We offer this at the risk of some repetition.

### FACTS

By 1962, Sylvania's share of the television market had declined to approximately one or two percent. It then changed its methods in an effort to obtain a larger share of the market. Under its new policy, Sylvania abandoned distribution through wholesalers and decided to sell only to selected retailers who would promote the Sylvania brand. It is undisputed that title to the television sets passed to these retailers. This plan, by limiting the number of franchises in a given area, would reduce intrabrand competition among retailers and serve as an incentive to carry and promote its product. Sylvania called this the "elbow room policy" and believed that these methods would allow it to improve its competitive position. In fact, under this new policy, it increased its market share to 5% in 1965, and, so it claims, this increase permitted it to remain in the market. Sylvania neither restricted franchised retailers from carrying other brands, nor did it require retailers to sell only to customers who lived within a particular territory. However, it did enforce location restrictions on its retailers and prohibited them from reselling its television sets from unauthorized locations.

Continental, one of Sylvania's largest retailers, is composed of a chain of retail stores. In 1965, it opened a new store in Sacramento, shipped sets from another store, and offered them for sale in that city in September, 1965. Sylvania concedes that it had an agreement with Continental under which it was prohibited from moving Sylvania brand merchandise to an unapproved location for resale, without Sylvania's prior approval. Sylvania refused to franchise the new store and, beyond question, hampered Continental's resale efforts in Sacramento. In this case, it is clear that Sylvania's purpose was to prevent more retail intrabrand competition in Sacramento, where most of its sales were by one important retailer.

As an outgrowth of this dispute, Sylvania set in motion a series of maneuvers which seriously affected Continental's ability to resell Sylvania's television sets. To that time, Continental's credit limitation with Sylvania had been $300,000.00 On September 16th, the credit limit was reduced to $50,000.00, at which time Sylvania cancelled pending orders and severed other friendly ties with Continental. About the same time, Sylvania demanded payment of accounts receivable, which had not been its practice in the past. The following October

---

1. In passing on whether or not to grant an injunction on the appellant's practices, the district court entered elaborate findings of fact which are in direct contradiction to many of the statements in the majority opinion. For example, footnote 30 of the majority opinion states that "[t]he elbow room policy was never used by Sylvania severely to restrict intrabrand competition or to divide markets. No dealer had a veto power over the entry of other dealers into his area, and locations were authorized by Sylvania solely on the basis of market expandability." However, in its 16th finding of fact the district court concluded that "the action of Sylvania [reducing Continental's credit line, cancelling Continental's orders, and cutting off all communication with Continental, among other things] was taken pursuant to the contract, combination or conspiracy alleged by Continental and was part and parcel thereof and at the instance of Sylvania's co-conspirator Handy Andy; and as a result thereof Continental was prevented from selling its Sylvania brand products in its store in Sacramento." The district court also found that on September 7, 1965, Sylvania's area sales manager advised Continental's principal operating officer "that due to prior 'commitments' which Sylvania had with Handy Andy, it was impossible for Sylvania to franchise Continental in Sacramento." Needless to say, the findings of the district court are implicit in and grow out of the jury's general verdict and its affirmative response to the previously maintained special interrogatory.

13th, it cancelled Continental's franchise. On the same day, the company through which Sylvania previously extended credit to Continental sued the latter to collect accounts which were allegedly due. Sylvania then accelerated the collection of the remaining indebtedness, repossessed all of Continental's Sylvania sets, attached its bank accounts and caused its main store and warehouse to be locked and closed. At about the same time, Sylvania notified Philco, another major supplier of Continental, of what it was doing.

Sylvania claims it acted for reasons unrelated to its locations policy and not in retaliation. However, it is manifest that some or all of these actions had something to do with the enforcement of the agreement to restrict locations. This follows since the jury was instructed:

"Therefore, if you find by a preponderance of the evidence that Sylvania entered into a contract, combination or conspiracy with one or more of its dealers pursuant to which Sylvania exercised dominion or control over the products sold to the dealer, *after having parted with title and risk to the products,* you must find any effort thereafter to restrict outlets or store locations from which its dealers resold the merchandise which they had purchased from Sylvania to be a violation of Section 1 of the Sherman Act, *regardless of the reasonableness of the location restrictions."* [Emphasis supplied.]

On the basis of the evidence and the quoted instruction, the jury answered the following special interrogatory in the affirmative.

"Did Sylvania Electric Products, Inc., engage in a contract, combination or conspiracy in restraint of trade in violation

of the antitrust laws with respect to location restrictions alone?"

There is no way of pinpointing the percentage of Sylvania's subsequent behavior that the jury attributed to enforcement efforts. However, it is obvious the jury concluded that Sylvania attempted to and did restrict Continental's business location pursuant to a contract, combination, or conspiracy in violation of the Sherman Act and to the damage of Continental.

Despite what is said on page one of the majority opinion, the district judge *did not* instruct the jury that Sylvania's practice of fixing by agreement the locations from which Continental was authorized to sell Sylvania products was illegal *per se* under § 1 of the Sherman Act. To the contrary, it is clear that the district judge presented to the jury the issue of whether Sylvania entered into a contract, combination or conspiracy with one or more of its dealers pursuant to which it exercised dominion and control over the product sold to the dealer after having parted with title and risk to the products, to restrict the territories in which the dealers may resell the merchandise.

The paragraph from the instructions quoted above is relied upon by the majority as a statement to the jury that location clauses are *per se* illegal. This is one of several interrelated paragraphs in the instructions dealing with the subject of territorial or customer restrictions. Standing alone, this paragraph requires proof both of a contract, combination, or conspiracy, and of an exercise of control by Sylvania after title and risk has passed to the dealers. This and related paragraphs read together also clearly informed the jury that Sylvania would be liable only if it exercised its control to restrict the territories in which the dealers resold.[1a]

---

1a. The pertinent instructions read:

"So too, concerted action in the form of dividing territories in which a dealer may resell merchandise purchased from the manufacturer without resale price maintenance constitutes a violation of the antitrust laws. That is to say, where a manufacturer, by means of a contract, combination or conspir-

acy, restricts the territories within which a dealer may resell merchandise purchased from the manufacturer, such a restriction is unlawful regardless of whether or not that restriction is good business practice from the manufacturer's point of view and is likely to assure adequate volume of profits. Any agreement, combination or conspiracy by

Counsel for both Sylvania and Continental so understood the instructions. In closing arguments Continental's counsel told the jury that Sylvania had committed a *per se* violation of the Sherman Act if Sylvania by conspiracy had imposed territorial or price maintenance restrictions on the resale of products purchased from Sylvania.[1b] Sylvania's counsel agreed, telling the jury that it was only required to decide whether Sylvania had fixed prices or controlled territories, which would be unlawful, or had franchised by location, which would be lawful.[1c]

> which a manufacturer interferes with the ordinary and usual forces of competition to restrict the territories within which dealers may resell merchandise which they have purchased from the manufacturer or to keep one dealer from competing for customers or sales in a territory or area served by another dealer also constitutes a violation of the antitrust laws, whether or not the territories resulting seem reasonable or unreasonable.
>
> "Therefore, if you find by a preponderance of the evidence that Sylvania entered into a contract, combination or conspiracy with one or more of its dealers pursuant to which Sylvania exercised dominion or control over the products sold to the dealer, after having parted with title and risk to the products, you must find any effort thereafter to restrict outlets or store locations from which its dealers resold the merchandise which they had purchased from Sylvania to be a violation of Section 1 of the Sherman Act, regardless of the reasonableness of the location restrictions.
>
> "On the other hand, on this question of territorial or customer restrictions, you are instructed that a manufacturer, such as Sylvania, has a right, acting alone and independently for its own business interests, to select its customers, and for this purpose, the manufacturer may grant an exclusive 'franchise' to certain dealers to whom, alone, he will sell his products. Also, it is lawful for the manufacturer to designate the location or locations of the place or places of business for which said dealer or dealers are franchised. It is also lawful for the manufacturer to decline or refuse to grant a dealer's request for a franchise at different or additional locations." [Tr. 3446–48]

**1b.** Continental's counsel said:

> "Ladies and Gentlemen, there are also types of antitrust cases, which this is, which

## THE CONSPIRACY

It is sufficient if the arrangement or combination is put together through the coercive tactics of the manufacturer alone. *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894 (5th Cir. 1973). See also *Osborn v. Sinclair Refining Co.,* 324 F.2d 566, 573–574 n. 13 (4th Cir. 1963), discussing *United States v. Parke Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

## ISSUE

In its simplest form, the principal issue before us is whether the district court com-

> are so pernicious, the policies are so pernicious to competition, so anti-competitive in their impact on our economy that the law states there is no possible way to justify them. And, ladies and gentlemen, the two restrictions involved in this case are such marketing, distribution restrictions: Territorial restrictions and price maintenance restrictions are what lawyers and courts call per se violations of the act if they are enforced by contract, combination or conspiracy.
>
> "So despite what Mr. Popofsky told you in his opening argument, despite what Prof. Preston testified to on the stand, the facts are that it is only necessary in this case to find, number one, that Sylvania had a policy by which it restricted the territory in which and/or customers to which Continental could sell Sylvania products after it had purchased them from Sylvania.
>
> "As a part of that distribution policy, Sylvania maintained minimum prices and enforced those minimum prices." [Tr. 3338]

**1c.** Sylvania's counsel said:

> "You will not be asked, as counsel pointed out, to make any decision about the reasonableness of the distribution practice or whether or not competition is or is not being bettered or furthered.
>
> "You will be asked only to decide what is the true character of the Sylvania practice. Was it the character that Continental suggests? Did it really involve price-fixing on the one hand and control over territories on the other, or did it, as we suggest, involve no more than a franchise by location practice?
>
> "If it is the latter we contend the instructions make it lawful. So you will be asked only to identify the character of the practice." [Tr. 3378]

mitted error in giving the mentioned instruction. The answer lies in the applicability of the *per se* rule stated in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), to the findings of the jury in this case.

## DISCUSSION

### I.

Nowhere in its elaborate opinion does the majority come to grips with the fundamental tenet of antitrust law established in *Schwinn*. The *Schwinn* Court made it absolutely clear that once a manufacturer has lost all control over the property, parting with title and risk, thereafter any effort on its part to restrict territory or persons to whom the property may be sold, whether by contract or by silent combination or understanding with the vendee, is a *per se* violation of Section 1 of the Sherman Act. The language of the *Schwinn* Court in stating the issue is of importance:

> "We are here concerned with a truly vertical arrangement, raising the fundamental question of the degree to which a manufacturer may not only select the customers to whom he will sell, but also, allocate territories for resale and confine access to his product to selected, or franchised retailers. *We conclude that the proper application of § 1 of the Sherman Act to this problem requires differentiation between the situation where the manufacturer parts with title, dominion, or risk with respect to the article, and where he completely retains ownership and risk of loss.*" 388 U.S. at 378, 87 S.Ct. at 1865, 18 L.Ed.2d at 1260. [Emphasis supplied.]

Here, it is conceded that Sylvania parted with title to, dominion over, and risk in connection with the television sets.

Speaking to the same subject, the *Schwinn* Court said:

> "Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with

dominion over it. . . . Such restraints are so obviously destructive of competition that their mere existence is enough. *If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale.*" *Id.* at 379, 87 S.Ct. at 1865, 18 L.Ed.2d at 1260. [Emphasis supplied.]

At this point, the Court emphasized that it was not prepared to adopt a *per se* rule which would prohibit vertical restrictions of territory and all franchising in instances where the *manufacturer retained ownership of the goods* saying that such a rule might severely hamper small enterprises resorting to reasonable methods of meeting the competition of giants and of merchandising through independent dealers. After this observation, the Court went on to say:

> "But to allow this freedom where the manufacturer has parted with dominion over the goods—the usual marketing situation—*would violate the ancient rule against restraints on alienation and open the door to exclusivity of outlets and limitation of territory further than prudence permits.*" *Id.* at 380, 87 S.Ct. at 1866, 18 L.Ed.2d at 1261. [Emphasis supplied.]

Further emphasizing its ban against restraint on alienation of a product once full title had passed, the Court said:

> "*Where the manufacturer retains title, dominion, and risk* with respect to the product and the position and function of the dealer in question are, in fact, indistinguishable from those of an agent or salesman of the manufacturer, it is only if the impact of the confinement is 'unreasonably' restrictive of competition that a violation of § 1 results from such confinements unencumbered by culpable price fixing." *Id.* at 380, 87 S.Ct. at 1866, 18 L.Ed.2d at 1261. [Emphasis supplied.]

It is only in these limited circumstances that the "rule of reason", so strongly urged by the majority, should be applied.

The majority suggests "that vertically imposed customer restrictions only" were involved in *Schwinn* and that the Court's

statements with reference to territorial limitations were dicta. It is clear that the majority in *Schwinn* thought otherwise. We quote:

"We come, then, to the legal issues in this case. We are here confronted with challenged *vertical restrictions as to territory and dealers.* The source of the restrictions is the manufacturer." *Id.* at 372, 87 S.Ct. at 1862, 18 L.Ed.2d at 1256. [Emphasis supplied.]

Some earlier Supreme Court decisions did not attach a rule of *per se* illegality to restraints on alienation in the antitrust context. The *Schwinn* Court has radically changed this position. Again speaking to the prohibition against restraint on alienation in a vertical relationship, the Supreme Court said at page 382, 87 S.Ct. at page 1867, 18 L.Ed.2d at page 1262.

"*Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred— whether by explicit agreement or by silent combination or understanding with his vendee—is a per se violation of § 1 of the Sherman Act.*" [Emphasis supplied.]

To further clarify the breadth of the *Schwinn* decision, we quote from page 378, 87 S.Ct. from page 1865, 18 L.Ed.2d from page 1259:

"[U]pon remand, the decree should be revised *to enjoin any limitation upon the freedom of distributors to dispose of the Schwinn products, which they have bought from Schwinn, where and to whomever they choose. The principle is, of course, equally applicable to sales to retailers, and* the decree should similarly enjoin the making of any sales to retailers upon any condition, agreement or understanding *limiting the retailer's freedom as to where and to whom it will resell the products.*" [Emphasis supplied.]

The *Schwinn* Court assumed jurisdiction and not only spoke on the subject of territorial and personal restraints against alienation, but issued a directive to the district court on the type of injunctive restraints to be placed upon *Schwinn.*

From the foregoing, we can arrive at no conclusion other than that any type of restraint on alienation by a manufacturer over a distributor *or a retailer,* be it territorial or personal, after title and dominion have passed, is a *per se* violation of the Act.

II.

The majority urges that the rule of *per se* illegality established in *Schwinn* should not be applied to a location restriction as utilized by Sylvania. It is forcefully argued that the location clauses here involved should be judged under what is commonly referred to as the "rule of reason," rather than a rule of *per se* illegality. As we see it, the majority's "critical and very obvious distinctions" between the restrictions in *Schwinn* and those of Sylvania are insignificant. The district court in the present case did not extend *Schwinn* to location clauses by "applying a bit of the literal language of *Schwinn* without reference to its context or the specific facts of that case. . . ." The court simply took the holding of *Schwinn* at face value and applied it to a set of facts which it logically encompasses.

It is argued that in *Schwinn* a wholesaler-distributor was foreclosed from selling Schwinn products to any purchaser located outside his *exclusive territory* and it is thus distinguishable. But, essentially the same thing can be said of the retailer in *Sylvania*. *Schwinn* defined the territorial boundaries within which each distributor could resell. Sylvania specified the precise location from which its retailer could resell. The Schwinn distributor was prohibited from selling beyond the boundaries of his territory. The Sylvania retailer is prohibited from reselling from any location not designated by the manufacturer. Schwinn had a territorial line fixed geographically. Sylvania has a territorial line fixed by the economic limitations upon an effective marketing area. While it is true that the Sylvania territorial line may not be as clearly defined as that in *Schwinn*, the overall territorial restriction upon competition is just as effective.

The majority's contention that *Schwinn* should not be applied in this case because Sylvania imposed neither territorial nor customer restrictions is impossible to reconcile with the jury verdict and the district court's findings of fact, which establish that the location clause operated as a territorial restraint. In its findings of fact, the district court quoted the Sylvania sales manual as follows:

> The manual states, inter alia, that the "franchise contains a good profitable selling climate by creating 'elbow room' in a sensible territory based on market and dealer potential. 'Same brand' competition is eliminated."

The district court found that "[a]lthough retail sales of Sylvania brand merchandise could be made to anyone, the sales could be made only from the store location approved by Sylvania. . . . By reason of the inherent limitations respecting advertising and promotion and delivery and service of sets sold, the territory of a retail dealer for sales was, for all practical purposes, limited to a radius of 25–50 miles from a dealer's store location."[2] It may be true in theory that, as the majority argues, "Sylvania's dealers could sell to customers from any area." But since none of Continental's dealers were located within 50 miles of Sacramento, as a practical matter Continental could not sell televisions in that city. The district court further found that the conspiracy between Sylvania and Handy Andy,

Sylvania's principal Sacramento distributor, "resulted in the number of Sylvania franchises in Sacramento being reduced from seven in 1963 to three in 1965 with Handy Andy selling all of the Sylvania color TV sets sold in Sacramento and 80 percent of the black and white ones during the first six months of 1966." The majority does not question the accuracy of any of these findings.[3] The district court thus examined the impact of the Sylvania locations practice, concluding that it amounted to a territorial restriction that prevented Continental from competing in Sacramento, a market in which there was only one significant Sylvania distributor. More importantly, these findings are implicit in the jury's verdict.

*Schwinn* did not expressly outlaw location clauses by name. It did, however, outlaw any and all territorial restrictions on resale to others. This necessarily includes all devices, the inevitable practical effect of which is to restrict a retailer's territory. We are convinced that Sylvania-type location clauses and *Schwinn* -type territorial restrictions are identical in effect and are both *per se* illegal under the command of *Schwinn*.

It is a cardinal rule of antitrust law that the purpose and effect of certain conduct— not its form—governs its legality. *Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 24, 84 S.Ct. 1051, 1054, 1058, 12 L.Ed.2d 98, 102, 106 (1964), teaches that when a court is faced with a new restricting device, the *effect* of

---

2. *Compare* Professor Schmitt's descriptions of the effects of the location clause employed by automobile manufacturers:

> The location clause inherently limits the dealer's ability to reach customers outside his marketing segment. The size of this segment varies according to the shopping habits of customers, traffic connections and population density. Even though a dealer is free to sell to customers wherever they may be located, the location clause secured market segmentation which effectively allows the manufacturer to control the degree of intra-brand competition. The location clause factually restricts the dealer's business activities directly in terms of territorial freedom and indirectly in terms of freedom of customer choice.

Schmitt, Antitrust & Distribution Problems in Tight Oligopolies—A Case Study of the Auto-

mobile Industry, 24 Hastings L.J. 849, 903–04 (1973).

3. The only finding of the district court questioned by the majority is the finding that Sylvania requested Maguire to sue Continental on its outstanding notes as a part of Sylvania's attempt to prevent Continental from selling Sylvania products in Sacramento. We do not agree that this finding is "in conflict with the finding of the jury that Maguire and Sylvania were not involved in any contract, combination, or conspiracy to enforce the location restriction." Majority Opinion, footnote 7. The jury's conclusion that Maguire was not part of the conspiracy to impose resale restrictions on Continental is consistent with a finding that Sylvania used Maguire in carrying out the conspiracy between Sylvania and Handy Andy found explicitly by the trial judge and by implication by the jury as well.

which is substantially the same as that of a method previously condemned as illegal, the *per se* rule must be applied to the new device. To the same effect is *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894, 899–901 (5th Cir. 1973).[4] This principle is especially applicable to Sylvania. It is sufficient if the restraint is present, in fact, whether the outgrowth of an express or an implied understanding. *Hobart Brothers Co., supra,* at 900; *Beverage Distributors, Inc. v. Olympia Brewing Co.,* 440 F.2d 21, 28 (9th Cir. 1971).

*Schwinn,* says the majority, involved a restriction on the locations and types of *vendees,* while Sylvania only imposed restrictions on the permissible locations of *vendors.* In attempting to limit the effect of *Schwinn,* the majority completely overlooks the *Schwinn* language outlawing any type of a restraint on alienation after the passage of title and dominion. Without giving a reason, the majority, in its interpretation of *Schwinn,* says: "It is clear to us that 'territory and areas' refer to the location of vendees, rather than vendors." There is nothing in *Schwinn* to suggest such a distinction. Moreover, since Sylvania's enforcement of its location clause, coupled with hard economic facts, prevented consumers in Sacramento from buying Sylvania televisions from Continental, the present case involves a direct limitation on the location of permissible vendees.

### III.

The majority's strained emphasis upon the decree of the district court on the *Schwinn* remand demonstrates the futility of its search to find a ready answer to the *Schwinn* directive. First of all, the district court decree could not alter or change the effect of the *Schwinn* decision. More importantly, that the district court followed

through on the *Schwinn* command is made clear by the following language of its judgment:

"Defendant Schwinn and the Association are each jointly and severally enjoined and restrained from, directly or indirectly, imposing, inducing, or securing any condition or any agreement or understanding that limits the freedom of any distributor or retailer of Schwinn products as to where and to whom it may resell such products, by oral or written statements or by acts of retaliation." 291 F.Supp. 564, 565 (N.D.Ill.1968).

It is true that the remand decree allowed Schwinn to designate in its retail franchise agreements the place of business for which a franchise is issued. Obviously this provision must be read in light of the language of the entire decree and of *Schwinn* itself. So read, it means only that a manufacturer can specify the location at which a retailer is the manufacturer's authorized representative and assign areas of primary responsibility, but that a manufacturer cannot impose resale restrictions forbidding retailers from selling the manufacturer's product except where the manufacturer allows.

We feel that Justice Clark, writing for the Court, properly interpreted the overall effect of the district court judgment on the *Schwinn* remand in *Reed Brothers, Inc. v. Monsanto Chemical,* 525 F.2d 486, 494 (8th Cir. 1975). He there said: ". . . [A] manufacturer may properly designate geographic areas in which distributors shall be primarily responsible for distributing its products and may terminate those who do not adequately represent it or promote the sale of its products in such areas." Citing *Schwinn* on remand, 291 F.Supp. 567, 568. The *Reed Bros.* decision fully supports our conclusion that *Schwinn* controls on our

---

4. In *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc., supra,* the manufacturer, Hobart, used an area of primary responsibility clause to limit the territory in which Gilliland would sell Hobart's products. Since Hobart not only manufactured but also sold on the same level as its dealers, the effect of the restriction was a horizontal division of markets eliminating competition between Hobart and its dealers. The court

concluded that "[s]uch an arrangement must be treated as it operated in practice rather than 'as arranged by skillful drafting.' *Cf. Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964)." *Id.* 471 F.2d at 899. *See Reed Bros., Inc. v. Monsanto Co.,* 525 F.2d 486, 489, 490, 494 (8th Cir. 1975); *Interphoto Corp. v. Minolta Corp.,* 417 F.2d 621, 622 (2d Cir. 1969).

facts. Time and time again, the *Reed Bros.* court echoes the *Schwinn* precept that once a manufacturer parts with title to and dominion over the product, it is a *per se* violation of the Sherman Act to restrict areas within which, or persons to whom, an article may be resold.

The majority also seeks support for its views in a provision of the decree on remand in *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). In fact, *Topco* strengthened and extended the *Schwinn per se* rule against territorial restrictions.[5] *Topco*, which struck down a horizontal division of territories, explained the reason for the *Schwinn per se* approach

> "Without the *per se* rules, businessmen would be left with little to aid them in predicting in any particular case what courts will find to be legal and illegal under the Sherman Act. Should Congress ultimately determine that predictability is unimportant in this area of the law, it can, of course, make *per se* rules in some or all cases, and leave courts to ramble through the wilds of economic theory in order to maintain a flexible approach." *Id.* at 609–10 n. 10, 92 S.Ct. at 1134, 31 L.Ed.2d at 527.

The majority would downgrade *Topco* by insisting that it was severely limited by the judgment on remand, which judgment was

---

5. *See Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934, 941–43 (5th Cir. 1975).

6. *United States v. Topco Associates, Inc.*, supra.

7. *United States v. Topco Associates, Inc.*, 1973–1 Trade Cases, ¶ 74,391 (N.D.Ill.).

I
*[Territories; Restrictions]*
 The defendant and its member firms have engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by restricting the territories within which or the customers to whom the member firms may sell Topco brand products.
 \* \* \* \* \* \*
III
*[Bylaws; Rules]*

---

later affirmed without comment by the Supreme Court.[6]

Upon remand in *Topco*,[7] the district court in the forepart of its decision carefully followed the decision of the Supreme Court by prohibiting the defendant from any type of an arrangement which would restrict the territories within which or persons to whom any member firm might sell products procured from or through Topco, and then went on to engage in a lot of gobbledygook, introducing what seems to be a meaningless paragraph V with reference to locations which, in pertinent part, reads:

"V

> Notwithstanding the foregoing provisions, nothing in this Final Judgment shall prevent defendant . . . (2) from designating the location of the place or places of business for which a trademark license is issued, provided that defendant shall not refuse to grant a trademark license to any member or withdraw a license from any member, except any withdrawal incident to the bona fide termination of any member firm's membership in Topco, if such action would achieve or maintain territorial exclusivity in any member firm; . . . ." *Id.* at ¶ 74,391.

While the provision is loaded with ambiguity, even at its clearest it can mean no more than that Topco could be entitled to desig-

---

Defendant is ordered and directed, within 210 days from the entry of the Final Judgment, to amend its bylaws, Membership and Licensing Agreements, resolutions, rules and regulations to eliminate therefrom any provisions which in any way limits or restricts the territories within which or the persons to whom any member firm may sell Topco brand products.
IV
*[Agreements]*
 Defendant is enjoined and restrained from adopting any bylaw, resolution, rule or regulation and from maintaining, adhering to, entering into or enforcing any contract, agreement, arrangement, understanding, plan or program in which Topco limits or restricts the territories within which or the persons to whom any member firm may sell products procured from or through Topco.

nate the location of the place or places of business for which a trade mark license is issued, provided that the granting of such location did not result in restricting the territories within which or the persons to whom any member firm might sell products procured from or through Topco, in violation of the Supreme Court *Topco* decision and Paragraphs I, III, and IV of the district court decision on remand.

That the attorneys for Topco on the appeal from the judgment on remand placed no such construction on the district court judgment is made evident by the following language taken from pages 5 and 6 of their brief on appeal, to-wit:

"The district court outlined in Paragraph V the activities in which the defendant could engage without violating the court's injunction. The government argues that Paragraph V renders the decreed relief inadequate 'because it fails to protect against and in fact permits continuation or renewal of the collective allocation of territories among competing sellers of Topco branded products' (Juris. Statement, p. 5) In fact it does not. *By its very terms Paragraph V forbids any of these practices if they are 'directly or indirectly used to achieve or maintain' the prohibited territorial restrictions.* (App.C, p. XX.) *If Topco were to engage in activity having such an effect, a violation of the decree would result."* [Emphasis supplied.]

With Topco making this concession, it is easy to understand why the Supreme Court affirmed without comment.

Early this year the Fifth Circuit in *Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934 (5th Cir. 1975), commenting on *Topco* and *Schwinn* said:

"Notwithstanding, *Standard Oil Co. v. United States,* 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 *Topco* and *Schwinn,* read together, suggest that at this point we must accept the fact that the Court has set its face against both horizontal and vertical territorial restrictions, with the possible exception of vertically imposed restrictions by 'new entrants' and

'failing companies' briefly mentioned in *Schwinn." Id.* at 943.

We are not persuaded by the majority's exhaustive analysis of *Copper Liquor.* No matter how it is digested, it reaffirms the *Schwinn* dogma that the Supreme Court has "set its face against both horizontal and vertical territorial restrictions, with the possible exception of vertically imposed restrictions by 'new entrants' and 'failing companies.'" Sylvania is neither a "failing company" nor a newcomer seeking to break into the television business.

As recently as November 15, 1975, the Fifth Circuit in *Eastex Aviation, Inc. v. The Sperry & Hutchison Co.,* 522 F.2d 1299, reaffirmed its position that where a manufacturer sells products to distributors subject to territorial restrictions on resale, there is a *per se* violation of the Sherman Antitrust Act and that it is unreasonable, without more, for a manufacturer to seek to restrict and confine areas of persons with whom an article may be traded after the manufacturer has parted with dominion over the article.

### IV.

The majority conveniently confuses and integrates location clauses and exclusive dealerships, claiming them to be so interdependent as to make exclusive dealerships useless without resale-type location clauses as an enforcement option. The two are clearly distinguishable. In an exclusive dealership, the distributor, dealer, or franchisee obtains a manufacturer's *self-imposed promise not to contract with another distributor in the general area.* A location clause with a restraint on alienation deals with the manufacturer's control over the place from which a distributor, dealer, or franchisee may resell a product. *Schwinn* expressly ordains the exclusive dealership to be an acceptable practice, as do cases on which the majority relies, for example, *Bushie v. Stenocord Corp.,* 460 F.2d 116 (9th Cir. 1972), and *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Neither

*Seagram & Sons* nor *Bushie* extend approval to location clauses, such as those under scrutiny. They deal solely with exclusive dealerships. It is one thing for a manufacturer to restrict its own behavior. It is quite another to try to restrict that of an independent business entity.

It is generally agreed that the utility of exclusive dealerships resides in the ability to manipulate the density of sales outlets. The grant of an exclusive dealership is but a promise by the manufacturer not to sell to other nearby distributors. This serves as the stimulus for active product marketing by dealers. However, under *Schwinn,* if a manufacturer uses the grant to prevent the dealer from reselling goods in which the dealer has full title and dominion, he is employing a prohibited restraint on alienation. Just because the courts have approved exclusive dealerships, such as involved in *Seagram & Sons* and *Bushie,* does not mean that manufacturers can employ a location clause to place a restraint on alienation in order to limit the territories in which their distributors can resell. We agree with the commentator who described as "fallacious" the "contention that the location clause is lawful as long as the manufacturer lawfully can grant exclusive franchises. These two types of restrictions are vastly different in terms of market impact. By an exclusive franchise agreement, a manufacturer voluntarily restricts itself. However, when the manufacturer imposes resale restrictions it exercises control over one of the most crucial competitive decisions which any truly independent tradesman must make—where and to whom he will sell his wares. To claim that granting an exclusive franchise is a lawful restraint on alienation on the manufacturer's part and to deny any analytical difference to restraints on alienation imposed on members of the next economic level is legal nonsense." *Schmitt, supra,* note 2 at 907–08.

The majority argues that applying a rule of *per se* illegality to location clauses renders the exclusive distributorship tool useless because it turns a dealer franchised somewhere into a dealer franchised everywhere. This argument is similar to the majority's contention that if a manufacturer has the right to designate the location where a franchise is valid, "then the manufacturer must have the power to enforce these rights if a franchisee violates his location clause agreement." According to the majority, the distinction between the right to approve locations and the right to limit the freedom of a distributor as to where it may sell is "artificial" or "spurious."

The majority commits the same mistakes with respect to both the right to franchise by location and the right to grant exclusive dealerships. Neither device is rendered useless by permitting Continental to sell Sylvania televisions in Sacramento. Sylvania can insure that its products are effectively marketed by granting exclusive distributorships, thereby limiting itself, and by assigning spaced locations and areas of primary responsibility, thereby imposing obligations on its dealers. But *Schwinn* bars territorial and customer restrictions on resale. Thus, once Sylvania's legitimate interest in full distribution of its products is satisfied, it has no right to prevent Continental from selling in Sacramento. An analogous distinction was made in *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc., supra.* The court stated that the manufacturer, Hobart,

> ". . . could refuse to deal with Gilliland, but that right did not give Hobart immunity so that it could use an illegal territorial restraint." *Id.* at 900.

The court in *Fontana Aviation, Inc. v. Beech Aircraft Corp.,* 432 F.2d 1080, 1085 (7th Cir. 1970), said that if this right is accompanied by an unlawful agreement "or conceived in . . . market control," then the right "transgresses" the antitrust laws. Similarly, in the present case, Sylvania's right to grant exclusive distributorships, to approve locations, and to assign areas of primary responsibility does not give it immunity to impose territorial restraints on resale. Arguments to the contrary amount to nothing more than veiled attacks on *Schwinn.*

## V.

Although location clauses operate to severely reduce or eliminate intrabrand competition, the majority argues that the *consequence* of such clauses is improved interbrand competition, a desirable end under the Sherman Act. That this reasoning, from an antitrust policy viewpoint, is fallacious is demonstrated by the following language in *Topco* :

> "*Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms.* And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. *Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy. Cf. United States v. Philadelphia National Bank,* 374 U.S. 321, 371, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915, 949 (1963).

> "The District Court determined that by limiting the freedom of its individual members to compete with each other, *Topco* was doing a greater good fostering competition between members and other large supermarket chains. But, the fallacy in this is that *Topco* has no authority under the Sherman Act to determine the respective values of competition in various sectors of the economy. On the contrary, the Sherman Act gives to each Topco member and to each prospective member the right to ascertain for itself whether or not competition with other supermarket chains is more desirable than competition in the sale of Topco-brand products. *Without territorial restrictions, Topco members may indeed*

*'[cut] each other's throats.'* . . . *But, we have never found this possibility sufficient to warrant condoning horizontal restraints of trade.*" 405 U.S. at 610–11, 92 S.Ct. at 1135, 31 L.Ed.2d at 527. [Emphasis supplied.]

Though a horizontal restraint case, *Topco* stands for the rule that restricted intrabrand competition cannot be justified by alleged interbrand competitive gain. This rule not only causes the majority rationale to fail, but it provides an excellent economic justification for the *Schwinn per se* rule, the preservation and encouragement of intrabrand competition, as a desirable end in itself. Under the *Schwinn per se* rule, small business, free enterprise, and the free market are all necessary beneficiaries.

## VI.

A few words about the majority's cases.

The exclusive dealership cases, including *Hawaiian Oke* and *Bushie,* have already been distinguished. Great weight is placed on *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), a case in which the Supreme Court declined to apply a *per se* rule to vertical restrictions, somewhat similar to those in *Schwinn*. In *White,* the Court simply said it was not yet ready to apply the rule. That the *White* Court did not refuse to apply the *per se* rule or reach the plateau attributed to it by Justice Stewart in his *Schwinn* dissent is made manifest by the following pertinent language:

> "*We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain.* . . . We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a 'pernicious effect on competition and lack . . . any redeeming virtue' . . . *and thereafter should be classified as per se violations of the Sherman Act.*" *Id.* at 263, 83 S.Ct. at 702, 9 L.Ed.2d at 746.[8]

---

8. The majority cites Justice Brennan's concurring opinion in *White Motor* as supporting the

lawfulness of area of primary responsibility covenants, which the majority defines as agree-

Justice Stewart's outrage at the breadth of the *Schwinn* decision is capsulized in his expression, "No previous antitrust decision of this Court justifies its action. Instead, it completely repudiates the only case in point, *White Motor*." 388 U.S. at 388–89, 87 S.Ct. at 1870, 18 L.Ed.2d at 1266. That the fundamental core of the *Schwinn per se* rule is the residence of title and risk is clearly established by Justice Stewart's dissent in which he can find no valid ground on which to apply the rule of reason to a principal-agent relationship and not apply the same rule to the relationship of vendor-vendee. The Justice's focus on the sales/agency dichotomy certainly demonstrates his view on the essence of the *Schwinn* decision. The *consent decree* on the remand of *White Motor, United States v. White Motor Co.,* 1964 Trade Cas. ¶ 71,-195 (N.D.Ohio), eliminating territorial and customer restraints from the franchised contract gives us considerable insight to the company's interpretation of the Supreme Court's decision.

The majority argues that the employment of the *Schwinn per se* rule on the facts of the present case would be wholly inconsistent with *United States v. General Motors Corp.,* 384 U.S. 127, 65 S.Ct. 357, 89 L.Ed. 311 (1966). The *Schwinn* Court pointed out that *General Motors* was, first of all, a horizontal restraint case. More than that, in *General Motors* the dealers initiated the

restraint, unlike the manufacturers in *Schwinn* and *Sylvania* and, finally, *General Motors* and other majority citations are highly suspect due to their age.

A case which is not old and on which the majority heavily relies is *Salco Corp. v. General Motors Corp.,* 517 F.2d 567 (10th Cir. 1975).[9] Although involving a franchise with a location clause, the authority of the decision on our point is fatally weakened by the failure of the court to recognize the *Schwinn* prohibition on resale, or even make known that such a prohibition was part and parcel of the *Schwinn* dogma. The only mention of *Schwinn* is in connection with the well known tenet that a manufacturer of a product for which equivalent brands are readily available in the market may select his customers and for this purpose may franchise certain dealers to whom, alone, he will sell his goods. No one disputes that rule. *Boro Hall Corp. v. General Motors Corp.,* 124 F.2d 822 (2d Cir. 1942), cited in *Salco,* is a relatively ancient case decided long before *Schwinn.* Additionally, the case is not in point. There the record clearly shows that there was no restriction on the used car dealer preventing the sale of automobiles outside the "zone of influence." For that matter, the dealer was notified that he could even establish a location outside of his zone of influence as long as it was not "unduly prejudicial to the interests of other dealers." This is a far cry

---

ments "obligating a distributor to concentrate his sole efforts in a specified geographical area. . . ." The thrust of the provisions approved by Justice Brennan, however, was "only that the dealer must adequately represent the manufacturer in the assigned area, not that he must stay out of other areas." 372 U.S. at 271–72, n. 12, 83 S.Ct. at 706, 9 L.Ed.2d at 751.

**9.** It is mentioned in the body of our dissent that *Salco* failed to recognize or even mention the *Schwinn* prohibition on resale. To demonstrate that this restriction is now fully recognized in the later 10th Circuit case of *World of Sleep v. Stearns & Foster Company,* 525 F.2d 40 (1975) we quote:

"The *Schwinn* case played a dominant role in the trial of the instant case, and the trial judge attempted to tailor his instructions to fit the teaching of that case. In *Schwinn,* it was held that where a manufacturer, such as

Stearns in the instant case, sells his product to a distributor, such as World of Sleep, and in connection with such sale 'firmly and resolutely' subjects the distributor to territorial restrictions upon resale, whether by 'explicit agreement or silent combination or understanding with his vendee,' a *per se* violation of the Sherman Act results." *Id.* at 44.

\* \* \* \* \* \*

"*Schwinn* also stands for the proposition that where a manufacturer does not sell his product to a dealer, but on the contrary retains title, dominion and risk with respect to the product, and the position of the dealer is akin to that of an agent or salesman of the manufacturer, a territorial limitation on such type of dealer is violative of the Sherman Act only if the impact of such limitation is 'unreasonably' restrictive of competition. . . ." *Id.* at 45.

from the concrete mold in which Sylvania attempted to place Continental.

The force of *Boro Hall* and *Salco* is further undermined by a recent exhaustive study of distribution practices in the automobile industry. Schmitt, supra, n. 2.[10] The author of the study concludes that "[i]n the context of automobile dealerships, the location clause constitutes a flat territorial prohibition. Any other conclusion would be a gross distortion of the hard economic facts." *Id.* at 904. He further concludes that the location clause is a device through which "the automobile manufacturers effectively have achieved control over intrabrand competition," which has no economic justification, and which "merely substitutes the manufacturers' decisions for those which a dealer should make on the basis of the dictates of the market." *Id.* at 905–06.

Finally, some comment should be made on the majority's quotation from an address by a Deputy Assistant Attorney General in the Antitrust Division. The quotation in the majority opinion is: "And only last year, a spokesman for the Antitrust Division stated that locations clauses 'are not illegal standing by themselves' since '[t]hey reflect the manufacturer's legitimate interest in having his goods distributed efficiently through a particular area.' " The context from which the quotation of Mr. Clearwater was taken is as follows:

> " 'Location' and 'primary responsibility' clauses—under which a seller designates the specific location of his purchaser-customer, or the geographic area in which the purchaser-customer is primarily responsible for the sale of the seller's products—are not illegal standing by themselves. They reflect the manufacturer's legitimate interest in having his goods distributed efficiently throughout a particular area. The purchaser-customer, however, is not restricted from selling elsewhere once the interests of the manufacturer are satisfied. *Reading between*

the lines, however, in those instances in which such clauses are in fact used as a means to impose a territorial restriction on sales, the Department would, of course, consider them illegal." (Clearwater, Franchising and the Antitrust Laws, May 16, 1974). [Emphasis supplied.]

Since, as both the jury and the district court found, the location clauses involved in this case were used by Sylvania to impose a territorial restriction on sales, "the Department would, of course, consider them illegal."

### VII.

Initially, Sylvania urged that it was entitled to an instruction on the "failing company" rule stated in *Citizens Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). The majority does not now press for an application of that rule. This is understandable. The evidence offered by Sylvania shows that by 1965 it had made a remarkable recovery from its unstable position in the early sixties. We agree with the trial judge that there was insufficient evidence to submit this issue to the jury.

### CONCLUSION

A close analysis and study of the majority opinion reveals that it is patterned after and closely follows Justice Stewart's lengthy and exhaustive dissent in *Schwinn.* When viewed in broad perspective, the majority holds that *Schwinn* is bad law and that we should adopt the Stewart approach. We decline to join in an opinion which, we believe, would *sub silentio* overrule a decision of the Supreme Court.

In urging affirmance, we do not go beyond the jury's verdict that Sylvania enforced its location agreement to create an illegal territorial restraint restricting the locations from which Continental could sell its products. We do not need to decide

---

**10.** After reviewing *Schwinn* and several other relevant authorities, the author states that

. . . to dust off the old *Boro Hall* decision and add that the location clause was not

rendered unlawful in *United States v. General Motors Corp.* thereby concluding that "the *Schwinn* decision does nothing to change prior law on the subject" is questionable at best.

whether a location clause, without more, creates a *per se* violation of the Sherman Act.

WE WOULD AFFIRM.

CHAMBERS, Circuit Judge (concurring and dissenting):

I concur in the judgment of the majority. I dissent from the stream of words used to arrive at the point of reversal. Naturally, this river of words brought forth elongated dissents.

One will note that the author of the majority opinion cites the Texas Law Review and other law review comments in his footnote No. 1. These are notes on this case. Law reviews used to wait until the judicial process in a case was complete before entering the fray. Now they chaperone us during the pendency of a case. This is their First Amendment right.

But if this practice of citing their current comment continues, then we shall be out lining up law reviews to support our views. After that we shall be taking the step of quoting the New York Times and the Chicago Tribune. And it will be an easy jump then to include in our opinions the current comments of the Abilene Bugle and Bisbee's Brewery Gulch Gazette.

BROWNING, Circuit Judge, with whom WRIGHT, Circuit Judge, concurs (dissenting):

It is the premise of the majority opinion that the jury was instructed that location clauses are per se illegal under the Sherman Act. Such an instruction, the majority argues: (1) is not supported by *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); (2) is inconsistent with the rule permitting exclusive dealerships; and (3) is at odds with the purpose of the Sherman Act.

Judge Kilkenny's opinion demonstrates that the majority's premise is not substantiated by the record. The jury was not instructed that it is unlawful for a manufacturer to designate the location for which a dealer is franchised. Precisely to the contrary, it was instructed that location clauses are lawful. The case was submitted to the jury on the theory that a violation of the antitrust laws is to be found *only* if Sylvania conspired to control the territories in which its dealers resold merchandise purchased from Sylvania. This was the understanding of counsel for both parties.

Judge Kilkenny's opinion further demonstrates that the legal theory reflected in the instructions is fully supported by *Schwinn*, and is consistent with the line of authorities upholding exclusive dealerships.

It is the purpose of this opinion to deal with the majority's third contention by showing that a major purpose of the Sherman Act is served by the rule prohibiting a seller from restricting the territory in which the purchaser resells the purchased merchandise. This opinion will also seek to establish that it is appropriate to classify such territorial restrictions as per se illegal, rather than to base illegality upon an ad hoc judicial determination of unreasonableness in the circumstances of each case.

I

The jury's verdict determined that Sylvania restricted the territory in which Continental could resell television sets purchased from Sylvania. Where to sell is a crucial business question. The answer determines the markets in which the seller will compete. Thus, Sylvania interfered with the exercise of Continental's business judgment in a way that significantly impaired Continental's freedom to compete.

Sylvania's conduct toward Continental thwarted an important purpose of the Sherman Act. Legislative history and Supreme Court decisions establish that a principal objective of the Sherman Act was to protect the right of independent business entities to make their own competitive decisions, free of coercion, collusion, or exclusionary practices.[1]

1. If the majority's statement that "the legislative intent underlying the Sherman Act had as its goal the promotion of consumer welfare" (Majority Opinion, p. 1003) is meant to exclude

Congress' general purpose in passing the Sherman Act was to limit and restrain accumulated economic power, represented by the trusts, and to restore and preserve a system of free competitive enterprise. The congressional debates reflect a concern not only with the consumer interest in price, quality, and quantity of goods and services, but also with society's interest in the protection of the independent businessman, for reasons of social and political as well as economic policy.[2]

The Supreme Court has implemented the statutory policy of protecting the independence of individual business units in a series of decisions banning resale price maintenance agreements. These cases are particularly relevant here for, like territorial restraints, resale price maintenance is justified by manufacturers as necessary to enable them to control intrabrand competition by independent dealers in the interest of effective interbrand competition. Indeed, "*any* argument that can be made on behalf

of exclusive territories can also be made on behalf of resale price maintenance."[3]

In the first resale price maintenance decision, *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), contracts between a manufacturer and its dealers setting minimum retail prices at which the product could be sold were held illegal in part because they created a "restraint upon alienation," which the Court described as "restricting the freedom of trade on the part of dealers who own what they sell." *Id.* at 407–08, 31 S.Ct. at 384, 55 L.Ed. at 518. The Court concluded that after Dr. Miles "sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic." *Id.* at 409, 31 S.Ct. at 385, 55 L.Ed.at 519.

Agreements requiring purchasing dealers to observe resale prices fixed by the vendor were held illegal per se in *United States v.*

other purposes, it is refuted by the legislative history referred to in the authorities cited herein. Even assuming that some contemporary economists might maintain that in a given case consumer interests might be better served by eliminating competition between independent businessmen, "There is little evidence that Sherman and the others had any idea of imposing an economist's model of competition on American industry. They did not consult economists of the time; and if they had done so, they would have found little support for any such course." A. Neale, The Antitrust Laws of the United States of America 13 (2d ed. 1970). In striking contrast to the views of the Congress, economists of the late 1800's considered "trusts" and other combinations to be a natural evolutionary advance, and monopolies to be both inevitable and potentially beneficial. Letwin, Congress and the Sherman Antitrust Law: 1887–1890, 23 U.Chi.L.Rev. 221, 237–38 (1956). Considering the level of economic thought prevailing in 1890, it is inconceivable that Congress passed the Sherman Act "out of an exclusive preoccupation with the idea that prices should always equal marginal costs." Blake & Jones, In Defense of Antitrust, 65 Colum.L.Rev. 377, 384 (1965).

**2.** "In the congressional debates, the Sherman Act was urged as a means of dealing with great trusts that had accumulated tremendous power threatening small businessmen, the consuming public, and the social order. Its purpose was variously conceived to be to preserve 'free and

full competition,' to protect the public against high prices, and to protect small business and individual freedom against corporate wealth and power. In the broad, general terms of the debates, the Senators appeared to regard these social, political, and economic purposes as consistent, collateral thrusts of the Act." Bohling, Franchise Terminations Under the Sherman Act: Populism and Relational Power, 53 Texas L.Rev. 1180, 1189 (1975). "The legislators were well aware of the common law on restraints of trade, and of the powers of monopolists to hurt the public by raising price, deteriorating product, and restricting production. At the same time, there was at least equal concern with the fate of small producers, driven out of business, or deprived of the opportunity to enter it, by 'all powerful aggregations of capital.'" C. Kaysen & D. Turner, Antitrust Policy 19 (1959). *See also United States v. Aluminum Co. of America,* 148 F.2d 416, 428 (2d Cir. 1945); A. Neale, *supra* note 1, at 12–13; H. Thorelli, The Federal Antitrust Policy 227 (1954); Blake & Jones, Toward a Three-Dimensional Antitrust Policy, 65 Colum.L.Rev. 422, 422–24 (1965); Blake & Jones, *supra* note 1, at 382–84.

**3.** Posner, Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger, and Potential Competition Decisions, 75 Colum.L.Rev. 282, 293 (1975).

*A. Schrader's Son, Inc.,* 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920), because such agreements are "designed to take away dealers' control of their own affairs and thereby destroy competition . . . ." *Id.* at 100, 40 S.Ct. at 253, 64 L.Ed. at 475. In *Simpson v. Union Oil Co.,* 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98, 102 (1964), the Court struck down a system of consignment agreements between a producer of gasoline and independent service station operators, stating, "If the 'consignment' agreement achieves resale price maintenance in violation of the Sherman Act, it and the lease are being used to injure interstate commerce by depriving independent dealers of the exercise of free judgment whether to become consignees at all, or remain consignees, and, in any event, to sell at competitive prices." *Id.* at 16, 84 S.Ct. at 1054, 12 L.Ed.2d at 104. The Court condemned the consignment program "[for] destroying competition in retail sales of gasoline by these nominal 'consignees' who are in reality small struggling competitors seeking retail gas customers." *Id.* at 21, 84 S.Ct. at 1057, 12 L.Ed.2d at 105. In *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), the Court held an agreement among competitors to fix maximum resale prices to be illegal because "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Id.* at 213, 71 S.Ct. at 260, 95 L.Ed. at 223.

The same theme of protecting the right of independent business entities to compete runs through Supreme Court decisions holding group boycotts illegal per se. In the first of these cases, *Montague & Co. v. Lowry,* 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608 (1904), the Supreme Court emphasized the impact of the restraint upon independent dealers, who had been precluded from conducting "their business as they had theretofore done." *Id.* at 47, 24 S.Ct. at 310, 48 L.Ed. at 612. In *Paramount Famous Lasky Corp. v. United States,* 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930), an agreement was held to violate section 1 of the Act because its purpose was to "coerce" independent theater owners into submitting to "unusual arrangements which unreasonably suppress normal competition." *Id.* at 43, 51 S.Ct. at 45, 75 L.Ed. at 150. Use of a boycott to end "style piracy" was outlawed in *Fashion Originators' Guild v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), in part because it "[took] away the freedom of action" of participants, *id.* at 465, 61 S.Ct. at 707, 85 L.Ed. at 953, and forced them to accept "a rival method of competition," *id.* at 467, 61 S.Ct. at 707, 85 L.Ed. at 954. Similarly, a group boycott was banned in *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), even though it might lower prices or temporarily stimulate competition, "[f]or, as this Court said in *Kiefer-Stewart Co. v. Seagram & Sons,* 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219, 223 'such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.' " 359 U.S. at 212, 79 S.Ct. at 709, 3 L.Ed.2d at 745. The Act was violated because the boycott "takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale, and in some instances forbids them from selling to it on any terms whatsoever." Id. at 213, 79 S.Ct. at 710, 3 L.Ed.2d at 745.

In many other contexts, the Supreme Court has rested decisions upon the premise that protection of the freedom to compete of separate business entities is an important objective of the Sherman Act. In *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), for example, the Court reasoned that the antitrust laws are an appropriate check upon anticompetitive conduct of market exchanges, "[s]ince the antitrust laws serve, among other things, to protect competitive freedom, i.e., the freedom of individual business

units to compete unhindered by the group action of others. . . ." *Id.* at 359–60, 83 S.Ct. at 1258, 10 L.Ed.2d at 401. A combination between General Motors and some of its dealers to eliminate sales through "discount houses" was held per se illegal in *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), because it served "to eliminate a class of competitors by terminating business dealings between them and a minority of Chevrolet dealers and to deprive franchised dealers of their freedom to deal through discounters if they so choose." *Id.* at 140, 86 S.Ct. at 1328, 16 L.Ed.2d at 423. In *FTC v. Brown Shoe Co.,* 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966), the Court commented as follows upon Brown Shoe Company's program requiring retail dealers to agree to buy shoes for resale only from the Brown Shoe Company and not from its competitors: "This program obviously conflicts with the central policy of both § 1 of the Sherman Act and § 3 of the Clayton Act against contracts which take away freedom of purchasers to buy in an open market." *Id.* at 321, 86 S.Ct. at 1504, 16 L.Ed.2d at 591. In *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court held the Sherman Act violated by an agreement between a union and a group of employees to impose uniform labor standards upon all employers in the industry, noting "the salient characteristic of such agreements is that the union surrenders its freedom of action with respect to its bargaining policy. . . . It is just such restraints upon the freedom of economic units to act according to their own choice and discretion that run counter to antitrust policy." *Id.* at 668, 85 S.Ct. at 1592, 14 L.Ed.2d at 635.

From the holdings and rationale of these and other Supreme Court decisions, "it seems clear that the protection of individual traders from unnecessary restrictions upon their freedom of action is a significant independent objective of antitrust policy."[4] As a commentator recently put it, "The most important of the social policy objectives found in the Court's antitrust decisions are the concepts of business independence and freedom of business opportunity."[5] In Judge Hand's well-known words, Congress was not "actuated by economic motives alone. It is possible, because of its indirect social or moral effect, to prefer a system of small producers, each dependent for his success upon his own skill and character, to one in which the great mass of those engaged must accept the directions of a few. These considerations, which we have suggested as possible purposes of the Act, we think the decisions prove to have been in fact its purposes."[6]

In *Schwinn* the Supreme Court relied upon several of the cases referred to above (*Dr. Miles Medical Co. v. John D. Park & Sons Co., supra; Klor's, Inc. v. Broadway-Hale Stores, Inc., supra; Fashion Originators' Guild v. FTC, supra;* and *United States v. General Motors Corp., supra*) in holding per se illegal "any limitation upon the freedom of distributors to dispose of the Schwinn products, which they have bought from Schwinn, where and to whomever they choose. The principle is, of course, equally applicable to sales to retailers, and the decree should similarly enjoin the making of any sales to retailers upon any condi-

---

4. Blake & Jones, *supra* note 2, at 436. *See also* Jones, The Growth and Importance of Franchising and the Role of Law, 12 Antitrust Bull. 717, 741 (1967).

5. Bohling, *supra* note 2, at 1190.

6. *United States v. Aluminum Co. of America,* 148 F.2d 416, 427 (2d Cir. 1945).

A perceptive foreign observer suggests that this preference for a system of independent, competing business entities reflects an American distrust "of all sources of unchecked power":

An economy made up of independent, competing business units fulfils the condition that economic decision making should be dispersed and renders the holders of economic power liable to mutual encroachment. It is important to this conception that the individual's right to engage in business activities of his own choice shall be preserved and that no single economic unit, whether in the form of monopoly or combination, shall be able to exclude rivals at its own behest and so render its own power immune from invasion. A. Neale, *supra* note 1, at 430.

tion, agreement or understanding limiting the retailer's freedom as to where and to whom it will resell the products." *United States v. Arnold, Schwinn & Co., supra,* 388 U.S. at 378, 87 S.Ct. at 1865, 18 L.Ed.2d at 1259.

The rationale suggested in this and other passages in *Schwinn* is fully and forcefully reiterated in *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515, 527 (1972):

Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster.

It is apparent that the *Schwinn-Topco* doctrine outlawing any contract, combination, or conspiracy to impose territorial restraints upon independent traders is founded upon an important and long recognized purpose of the Sherman Act.

## II

The remaining question is whether restraints upon the territory in which independent dealers may resell should be condemned without regard to the reasonableness of the restraint in a particular case.

Quoting from *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958), the majority argues that the rule of per se illegality should apply only to a restraint that has a "pernicious effect on competition" and also "lacks any redeeming virtue." The majority recognizes that a territorial restraint upon dealers does eliminate

competition in the sale of the manufacturer's products. The majority argues, however (in part upon the authority of Mr. Justice Brennan's concurring opinion in *White Motor Co. v. United States,* 372 U.S. 253, 269, 83 S.Ct. 696, 705, 9 L.Ed.2d 738, 750 (1963)), that a territorial restraint upon dealers may have the "redeeming virtue" of enhancing competition in the sale of the products of different manufacturers. The majority concludes that the "rule of reason" therefore applies, and the reasonableness and hence the legality of territorial dealer restraints should be left to the jury to decide in each case.

The major flaw in this argument is that it ignores the two most relevant and recent cases, *Schwinn* and *Topco.* As Judge Kilkenny's opinion demonstrates, the jury found that Sylvania conspired to control the territories in which Continental and other Sylvania dealers sold products purchased from Sylvania. *Schwinn* and *Topco* hold such conduct to be illegal per se under the Sherman Act.

This should end the matter for an intermediate appellate court, even if the correctness of the *Schwinn-Topco* analysis were doubtful. A reexamination of the *Schwinn-Topco* analysis in the light of the facts of this case, however, demonstrates that the analysis is sound.

The Supreme Court did not merely resurrect the rule against restraints on alienation in drawing the line separating vertical territorial restraints that are per se illegal from those prohibited only if shown to unreasonably restrict competition.

The naked transfer of title is not a determinative fact. The per se rule may be applicable though the manufacturer retains title. It applies unless "the position and function of the dealer in question are, in fact, indistinguishable from those of an agent or salesman of the manufacturer . . . ." 388 U.S. at 380, 87 S.Ct. at 1866, 18 L.Ed.2d at 1261.[7] Thus, the line drawn

---

7. Under *Schwinn* "a juggling of labels or of the place of passage of title will not suffice to invoke rule of reason treatment. Nor will the casting into the consignment mold of relation-

ships with independent economic entities in the distribution business, whose business decisions on the sale of the products would reflect functions, investments, and goals which in fact dif-

separates restraints imposed by a principal upon his agent, from those imposed by one independent business entity upon another.[8] Even if the applicability of the per se rule depended entirely upon the passage of title, that event usually serves to distinguish independent business entities operating on different functional levels of distribution; for, as the Court noted in *Schwinn,* "most merchandise is distributed by means of purchase and sale." 388 U.S. at 379, 87 S.Ct. at 1866, 18 L.Ed.2d at 1260. It is therefore evident that the Court has located the boundary for application of the per se rule in a way that serves the Sherman Act's purpose of preserving the competitive freedom of independent businessmen.

Despite the majority's contention that a per se rule is appropriate only if the restraint "lacks any redeeming virtue," the Supreme Court's holding in *Schwinn* and *Topco* that a restriction upon the territory in which independent traders may resell is per se illegal did not depend upon a conclusion that this restraint has no affirmative value. On the contrary, the Supreme Court recognized that in some circumstances a territorial restraint may promote competition. The Court held that such a restraint is nonetheless per se illegal when imposed upon independent business entities (1) because such a restraint is "obviously destructive" of competition among independent dealers, and (2) because it is not an appropriate judicial function to strike a public interest balance between the certain loss of competition among independent dealers and a possible gain of competition at some other point in the marketing process.

The fact that territorial restrictions inevitably eliminate intrabrand competition among independent dealers is, as the Supreme Court said, obvious.[9] Sylvania concedes as much. Continental's efforts to compete with Handy Andy in the sale of Sylvania products in the Sacramento area were frustrated by Sylvania's enforcement of the location clause. The district court found that after Continental's effort to compete was aborted, Handy Andy sold all of the Sylvania color television sets that were sold in Sacramento.

The Supreme Court knew that benefits to interbrand competition were asserted to

fer from those of the producer, serve to immunize restrictions. In fact, as well as in form, the consignee's function must be close to that of a mere salesman for the producer, for the law to tolerate producer-imposed restrictions on the consignee's decision-making." Zimmerman, Distribution Restrictions After Sealy and Schwinn, 12 Antitrust Bull. 1181, 1188–89 (1967); *see* Johnson, The Role of Agency and Sale in Antitrust: General Electric, Simpson, Schwinn, 53 Minn.L.Rev. 57, 67 (1968). When asked whether a supplier could avoid the impact of *Schwinn* by switching to distribution by consignment, Professor Turner (then Assistant Attorney General in charge of the Antitrust Division) replied:

> [O]ur position would be that any time we see price fixing and resale price maintenance, territorial restrictions, or customer limitations imposed on distributors—though they be called consignees—who are performing significant functions in addition to a selling function, and there is no excuse of the kind we have indicated we think reasonable, such as new entrants, we will attack those restrictions.

Panel Discussion, Orderly Marketing, Franchising and Trademark Licensing: Have They Been Routed by Schwinn and Sealy? 1968 Antitrust Law Symposium 27, 44. *See also* Simpson v.

Union Oil Co., 377 U.S. 13, 20–22, 84 S.Ct. 1051, 1056–1058, 12 L.Ed.2d 98, 104–105 (1964).

**8.** Professor Averill writes that behind *Schwinn* is "the idea that each separate unit of a distribution system which risks its capital and relies upon its own initiative to market a product deserves to have commensurate authority to freely decide how, where and to whom it will sell." Averill, Sealy, Schwinn and Sherman One: An Analysis and Prognosis, 15 N.Y.L.F. 39, 64 (1969). Other commentaries in which *Schwinn* is identified with a purpose to promote and preserve the freedom of independent economic units include Jones, *supra* note 4, at 746; The Supreme Court, 1966 Term, 81 Harv. L.Rev. 69, 236 (1967); Note, Antitrust Law and The New Industrial State: An Application to Automobile Distribution Practices, 4 U.S.F.L. Rev. 78, 105 (1969).

**9.** 388 U.S. at 379, 87 S.Ct. at 1865, 18 L.Ed.2d at 1260. *See Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934, 941 n.5 (5th Cir. 1975) ("Vertically imposed territorial restraints have the obvious effect of reducing or eliminating intrabrand competition, whatever their effect may be on interbrand competition").

flow from manufacturer control of the marketing areas in which dealers sold. It was because of such benefits that the Court sustained territorial restrictions as applied to Schwinn's dealers who were in fact indistinguishable in position and function from "an agent or salesman" of Schwinn.[10] However, the Court declined to consider asserted benefits to interbrand competition where, as in this case, the effect of the territorial restrictions was to eliminate competition among dealers who were independent business entities.[11] Thus, the Court in both *Schwinn* and *Topco* invoked a per se rule against territorial restraints on resale because they are destructive of intrabrand competition in spite of any beneficial impact they might have on interbrand competition.

The Supreme Court has held that it is not an appropriate judicial function to weigh the loss of intrabrand competition against an alleged gain in interbrand competition in determining whether the Sherman Act has been violated for two related reasons. The first is that courts are ill-equipped to resolve the complex economic problems involved in deciding in a given case whether elimination of intrabrand competition among dealers through territorial restrictions in fact produced compensating gains in interbrand competition among producers. As the Court said in *United States v. Topco Associates, Inc., supra,* 405 U.S. at 609–10, 92 S.Ct. at 1134, 31 L.Ed.2d at 526:

> The fact is that courts are of limited utility in examining difficult economic problems. Our inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another is one important reason we have formulated per se rules.

If the courts were required to review such issues under a "rule of reason," unpredictable ad hoc determinations as to what is or is not illegal under the Sherman Act would result. The Supreme Court suggested that a rule of reason should be applied in this area only if Congress were to decide that predictability is unimportant and that the courts should be "free to ramble through the wilds of economic theory in order to maintain a flexible approach." *Id.* at 610

---

**10.** 388 U.S. at 380–81, 87 S.Ct. at 1866–67, 18 L.Ed.2d at 1260–62. The Court explicitly looked to the "product market as a whole," intrabrand and interbrand, in applying the rule of reason to Schwinn's distribution through consignees under which Schwinn retained ownership and risk. *Id.* at 382, 87 S.Ct. at 1867, 18 L.Ed.2d at 1262.

For further evidence that the Court was fully aware of the alleged benefits to interbrand competition of Schwinn's distribution program, see Keck, The Schwinn Case, 23 Bus.Law. 669 (1968).

**11.** Topco defended its use of territorial division in terms nearly identical to those employed by Schwinn and Sylvania:

> Topco essentially maintains that it needs territorial divisions to compete with larger chains; that the association could not exist if the territorial divisions were anything but exclusive; and that by restricting competition in the sale of Topco-brand goods, the association actually increases competition by enabling its members to compete successfully with larger regional and national chains.

*United States v. Topco Associates, Inc., supra,* 405 U.S. at 605, 92 S.Ct. at 1132, 31 L.Ed.2d at 524. The Supreme Court's rationale for not considering Topco's economic justification for stifling intrabrand competition was applied not only to the horizontal division of territories in which members could retail Topco-brand goods, but also to territorial and customer restrictions on wholesaling by members of Topco. *Id.* at 612, 92 S.Ct. at 1135, 31 L.Ed.2d at 528. The Court reasoned that:

> [l]ike territorial restrictions, limitations on customers are intended to limit intra-brand competition and to promote inter-brand competition. For the reasons previously discussed, the arena in which Topco members compete must be left to their unfettered choice absent a contrary congressional determination. *United States v. General Motors Corp., supra;* cf. *United States v. Arnold, Schwinn & Co., supra* . . . .

*Id.* Like the restraints held per se illegal in *Topco,* Sylvania's vertically imposed territorial restriction on Continental was intended to limit intrabrand competition and promote interbrand competition. Thus, the reasons given by the Court in *Topco* for not examining the "difficult economic problems" involved in attempting to balance losses in competition in one sector of the economy against alleged gains in another are equally relevant in this case.

n.10, 92 S.Ct. at 1134 n.10, 31 L.Ed.2d at 527 n.10.[12]

The question the majority would submit to the fact finder is not whether the challenged conduct restrains competition, but whether the admitted restraint on intrabrand competition produces net economic benefits through enhanced interbrand competition. In the majority's words, "Whether some diminution in intrabrand competition is justified when it averts the loss of one competitor in an industry that is already oligopolistic should ultimately be a question for the finder of the facts."

The majority frankly acknowledges "that, as a matter of economic theory, there is a sharp divergence of opinion as to the alleged procompetitive effect of vertical territorial restrictions,"[13] but regards this disagreement as a reason for submitting the question of the legality of such restraints to the fact-finding judge or jury. (Majority Opinion note 40) The majority's view of the judicial function is at odds with *Schwinn, Topco,* and the traditions and precedent on which they rest. It is also an invitation to a fruitless enterprise.

Sylvania's own expert witness, Professor Lee E. Preston, testified that in the present state of economic analysis it is not possible to determine the effect that changes in marketing practices at one level of a market will have at other levels.[14]

The majority quotes portions of the testimony of Professor Preston as "substantial evidence from which the jury might have reasonably concluded that Sylvania's location practice, rather than unreasonably restricting competitive market forces, actually had a procompetitive effect in that it enabled a marginal producer to achieve the status of a viable competitor in an industry threatened by oligopolistic tendencies." Majority Opinion at 1001–1002 & n.36. But Professor Preston did not testify that permitting Sylvania to limit dealer locations would enhance competition among producers. He made only the guarded assertion that "*if* we squeeze out the bottom firms . . . we would see a decline in competition," and "*if* this distribution policy or any particular distribution policy has the effect of strengthening Sylvania or any other smaller firm as a competitive force . . . then I think we have to look carefully at that policy as an element in competition, indeed as a procompetitive policy . . . ." (emphasis added). Even this limited prediction was dependent on a number of assumptions, at least one of which the jury verdict found to be untrue: Professor Preston conceded that "[i]t would change the whole analysis" if Sylvania restricted the territo-

---

**12.** The Court quoted Mr. Justice Black's explanation of the need for per se rules in such situations in *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958): "This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." 405 U.S. at 607, 92 S.Ct. at 1133, 31 L.Ed.2d at 525.

**13.** Refutations of the claimed economic justifications for such vertical restraints can be found in Comanor, Vertical Territorial and Customer Restrictions: White Motor and Its Aftermath, 81 Harv.L.Rev. 1419 (1968); Stone, Closed Territorial Distribution: An Opening

Question in the Sherman Act, 30 U.Chi.L.Rev. 286 (1963); Schmitt, Antitrust and Distribution Problems in Tight Oligopolies—A Case Study of the Automobile Industry, 24 Hastings L.J. 849, 904–05 (1973). It is worth noting, for example, that there is substantial economic opinion that because territorial restrictions upon franchising dealers enhance product differentiation, such restrictions eliminate not only intrabrand, competition, but competition between brands as well. Comanor, *supra,* at 1437; Zimmerman, *supra* note 7, at 1183–85; Schmitt, *supra,* at 906.

The economic justifications offered in support of vertical restraints are carefully examined and rejected by Judge Wisdom in *Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934, 941–43 n.5 (5th Cir. 1975).

**14.** *See also* Preston, Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards, 30 Law & Contemp.Prob. 506, 508–09 (1965).

ries in which dealers would resell (R.T. 2910–11, 2917–18).[15]

Moreover, the limited value of Professor Preston's testimony to Sylvania was dissipated on cross-examination. The relevant testimony is quoted in the margin.[16] Professor Preston admitted there was no necessary connection between the use of location clauses and Sylvania's ability to maintain its present market share. He recognized that there were, "of course," many other

reasons besides the locations practice that could explain Sylvania's four to five percent market share. Most important, as noted earlier, Professor Preston conceded that it is impossible to specify the impact of changes at the retail level on competition at the manufacturing level.

A judge or jury should not be expected to determine whether Sylvania's locations practice contributed to Sylvania's success in interbrand competition when Sylvania's expert witness was unable to do so.[17] Because

15. Other critical assumptions made by Professor Preston were that Sylvania did not set up location patterns in response to dealer requests or demands (R.T. 2904); that Sylvania did not use coercive means to prohibit a dealer in one territory from selling in another territory (R.T. 2905–07); that no dealer relied to a greater extent than normal on Sylvania for product (R.T. 2907–09); and that no excluded dealer was an especially vigorous competitor (R.T. 2929–30).

16. Q. There could be other reasons, couldn't there, that Sylvania was able to maintain a 4 to 5 percent share of the market nationally besides the use of this particular distribution policy?
A. Oh, many other reasons, of course.
Q. In other words, quality of the product?
A. Of course.
Q. That could be a reason.
A. Yes.
Q. Promotion?
A. Yes.
Q. Advertising?
A. Yes.

. . . . .

Q. So you are not saying that it necessarily follows that these particular distribution policies were or are necessary in order that Sylvania be able to maintain its present market share, are you?
A. No, I certainly am not.
Q. There is no way to tell, is there?
A. I suppose given enough imagination and spending enough money we might conduct some kind of research to satisfy ourselves on it, but I don't think we would be able to.

. . . . .

Q. There is really no way you can tell from the competitive effect at a retail level—you can't tell from that type of information what the competitive effect at the manufacturing level is going to be, can you?
A. They are not the same thing. I agree with that, that they are not the same.
Q. And there doesn't seem any direct correlation between the two?

A. Of course, if a firm, as I say, was pricing its product way out of competitive limits at the retail level, then it would show a decline in marketing shares at the manufacturing level.
Q. Didn't you say in this article, starting at page 508 in Duke Law Review:
"A closely related matter is the interaction between horizontal and vertical market relationships. The present state of economic analysis doesn't in general permit us to specify the impact of changes of one of several vertically related market levels upon structure and behavior at another."
A. Yes, you are quoting from my own writing.
Q. Right, and that was true at the time you wrote this article?
A. Yes.
Q. And it is still true?
A. I have been working on that since then and have written more about it. I think I have a few more ideas but they don't answer the questions yet.
Q. Basically that is still true?
A. Yes, I think that is right.
R.T. at 2955–58.

17. In fact, there is today no generally accepted body of economic doctrine that could serve as a guide in applying the Sherman Act and other antitrust statutes. *See, e. g.,* A. Neale, *supra* note 1, at 429; Bohling, *supra* note 2, at 1188; Bernhard, Competition in Law and in Economics, 12 Antitrust Bull. 1099, 1156–61 (1967); Dewey, The Economic Theory of Antitrust: Science or Religion?, 50 U.Va.L.Rev. 413, 430–31 (1964).

Commentators who set maximum productivity "as the sole, or central, objective for the law's rules of competitive behavior" and argue that the science of economics can provide standards for judgment in antitrust cases have been said by one economist to rely upon economic theory that "is, unfortunately, so elementary that it is, to a large extent, irrelevant." Bernhard, *supra*, at 1115–17, 1151. *See also* Samuelson, The Monopolistic Competition Revolution, in Monopolistic Competition Theory: Studies in Impact 105–36 (1967).

the interbrand effects of Sylvania's locations practice cannot be measured, a decision as to whether the net effect of the practice was procompetitive would be sheer guesswork. Finally, as has been shown, even if a net gain in purely economic terms could be established, such restraints could not be sustained consistent with *Schwinn, Topco,* and the purpose of the Sherman Act to maintain the competitive freedom of independent business units.

The second reason given by the Supreme Court in *Topco* in support of its holding that courts are unsuitable for the task of deciding whether intrabrand competition among independent dealers should be sacrificed to promote interbrand competition among producers, is that the question is one of public policy properly determined by Congress. The Court said, 405 U.S. at 611–12, 92 S.Ct. at 1135, 31 L.Ed.2d at 528:

> If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion, this too is a decision that must be made by Congress and not by private forces or by the courts. Private forces are too keenly aware of their own interests in making such decisions and courts are ill-equipped and ill-situated for such decisionmaking. To analyze, interpret, and evaluate the myriad of competing interests and the endless data that would surely be brought to bear on such decisions, and to make the delicate judgment on the relative values to society of competitive areas of the economy, the judg-

ment of the elected representatives of the people is required.

A judicial tradition, dating at least from Judge Taft's opinion in *Addyston Pipe* in 1898,[18] bars the courts from weighing conflicting economic predictions to determine the public interest in antitrust litigation.[19] Even when applying the "rule of reason," the courts have not inquired whether " 'on some ultimate reckoning of social or economic debits or credits' the conduct may be deemed beneficial. 'A value choice of such magnitude is beyond the ordinary limits of judicial competence . . . .' "[20]

This tradition is founded, as the Supreme Court said in *Topco,* both upon the inadequacy of the judicial process to deal with such disputes, and upon a conviction that questions of economic policy are for legislative rather than judicial determination. "[T]he courts have shown that they can get at the facts of agreement and restrictive intent but cannot find a truly justiciable issue in the choice between rival economic predictions."[21] As the Court said in *United States v. Singer Manufacturing Co.,* 374 U.S. 174, 196, 83 S.Ct. 1773, 1785, 10 L.Ed.2d 823, 839 (1963), "Whether economic consequences of this character warrant relaxation of the scope of enforcement of the antitrust laws, however, is a policy matter committed to congressional or executive resolution. It is not within the province of the courts, whose function is to apply the existing law."[22]

Finally, there is no substance in the majority's prophesy of catastrophic conse-

---

18. *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 283–84, 291 (6th Cir. 1898), *aff'd* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

19. A. Neale, *supra* note 1, at 435. Illustrative cases include *United States v. Trenton Potteries Co.,* 273 U.S. 392, 398, 47 S.Ct. 377, 379, 71 L.Ed. 700, 705 (1927); *Standard Oil Co. v. United States,* 337 U.S. 293, 308–14, 69 S.Ct. 1051, 1059–62, 93 L.Ed. 1371, 1383–86 (1949); *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 371, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915, 949 (1963).

20. Loevinger, The Rule of Reason in Antitrust Law, 50 U.Va.L.Rev. 23, 34 (1964), quoting *United States v. Philadelphia Nat'l Bank,* 374

U.S. 321, 371, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915, 949 (1963).

21. A. Neale, *supra* note 1, at 440.

22. Professor Kingman Brewster, Jr., wrote that "the values served by not having courts act like legislative bodies are just as important to the society as are the values which might be served by having every case decided by economically rational but essentially *ad hoc* determinations of the public economic interest. The net goodness or badness of effects is not a proper subject of judicial determination." Brewster, Enforceable Competition: Unruly Reason or Reasonable Rules?, 46 Am.Econ.Rev. 482, 487 (1956).

quences to the competitive vigor of the economy if Sylvania's use of location clauses to impose territorial restrictions on independent dealers is held illegal per se.

The majority predicts that if sellers are prevented from restricting the areas in which purchasers may resell, "giant franchisees" might replace "loyal networks of small businessmen"; small manufacturers might perish due to an inability to attract dealers; and larger manufacturers might eliminate franchisees by integrating vertically. The end result of all this would be "the insidious evil of total monopolization." Majority Opinion at 1000–1001, 1003–1004.

The majority's concerns are speculation.

They rest, moreover, on a false premise. The majority refers to "franchising" as if it were a unitary phenomenon uniformly affected by *Schwinn* and this case. But there are many types of franchising. Trademark franchising, or the franchising of an entire business or service, for example, "perhaps the most dynamic segment of contractual systems," does not involve the sale of a product, and may not be subject to *Schwinn's* restrictions at all.[23]

The majority's suggestion that elimination of territorial restrictions might lead to the creation of large franchisees with several outlets, and that this result would be undesirable is nothing more than an argument against competition. Chain stores cannot be prohibited in the name of free competition. If chain franchisees succeed in free competition among independent businessmen making their own decisions, and without predatory conduct, neither the letter nor spirit of the Sherman Act will be offended.

The majority offers no evidence to support its assertion that producers might be unable to develop a distribution system unless they are permitted to guarantee dealers a protected market; and there is substantial evidence to the contrary. "[H]undreds of manufacturers have for years been successfully operating under antitrust decrees forbidding precisely the same type of product control held per se illegal in *Arnold, Schwinn & Co.* Injunctive provisions of this type have long been standard in Department of Justice consent and litigated decrees."[24]

"Predictions of vertical integration" because of antitrust condemnation of vertical restrictions "have proved to be remarkably unreliable in the past."[25] It is unlikely that they would be more reliable in this instance. Producers distribute through independent dealers rather than through their own employees because it is economically advantageous to do so. Vertical integration by a producer into retail distribution is particularly uneconomic. Distribu-

---

23. D. Thompson, Contractual Marketing Systems 21 (1971). *See also* Pollack, Alternative Distribution Methods After Schwinn, 63 Nw.U. L.Rev. 595, 601–02 & n.35 (1968); Jones, *supra* note 4, at 741–42; FTC, Report of Ad Hoc Committee on Franchising, at 31 (1969). In the latter report it is said with respect to the relevant Supreme Court decisions that:

In laying down these principles, the Court was not directing its attention to arrangements involving the franchising of an entire business or service which is promoted nationally under a trademarked name and associated in the public mind with a highly distinctive external appearance or with a standardized uniform operation. There is no indication that the Court intended these decisions to apply across the board to trademark-licensing arrangements, also frequently subsumed under the term franchising, in which the licensor imposes restrictions on the licensees to ensure the identity of origin, quality,

and uniformity of the trademarked product and thus preserve his rights in the trademark. Nothing in any of the Court's four opinions would suggest that even in the case of outright sales of trademarked products the Court intended to modify established trademark law which requires the trademark owner to maintain sufficient control over his licensees to assure that his mark will not be deemed abandoned and that the licensee will apply the mark either to the same products or to products of substantially the same quality that the public in the past has associated with the mark.

24. Williams, Distribution and the Sherman Act—The Effects of General Motors, Schwinn and Sealy, 1967 Duke L.J. 732, 735. *See also* Zimmerman, *supra* note 7, at 1186–87 & n.8.

25. Schmitt, *supra* note 13, at 911–12; *see* Williams, *supra* note 24, at 735.

tion is a relatively low profit activity.[26] Both capital and operating costs are high.[27] The product "mix" required in most retail operations cannot be furnished by a single producer: "Nobody is going to set up a distribution system to sell toothpaste, no matter what the antitrust laws say."[28] Television sets also may be among the "vast numbers of commodities" for which "it is just hopelessly inefficient to set up a distribution system to handle that commodity only."[29] Continental, for example, sold the products of several manufacturers. Moreover, independent businessmen often bring to distribution qualities such as a "sense of responsibility, industriousness, attention to costs and desire to earn a profit," which are not ordinarily found in salaried employees.[30] Finally, franchising offers significant advantages in avoiding local labor problems, administrative burdens, and a variety of additional taxes.[31] These substantial economic advantages of franchising will remain even if producers are prevented from dictating the territory in which independent dealers resell. The only reasonable prediction, therefore, is that if the district court were affirmed in this case, producers would continue to distribute through independent dealers rather than integrate forward.[32]

26. Preston, *supra* note 14, at 512.

27. "[T]he cost of automobile distribution, in labor and capital, is almost as great as the cost of manufacturing them." Note, *supra* note 8, at 110. *See also* Schmitt, *supra* note 13, at 870–71.

28. Panel Discussion, *supra* note 7, at 57 (remarks of Donald Turner).

29. *Id.*

30. Jones, *supra* note 4, at 724; *see, e. g.,* Zimmerman, *supra* note 7, at 1186.

31. *See, e. g.,* H. Brown, Franchising—Realities and Remedies vii–viii (1973); Jones, *supra* note 4, at 723–24; Note, Restricted Channels of Distribution Under the Sherman Act, 75 Harv.L. Rev. 795, 834 (1962).

32. *See* Schmitt, *supra* note 13, at 912–13; Stone, *supra* note 13, at 315–16; Zimmerman, *supra* note 7, at 1186–87; Panel Discussion, *supra* note 7, at 55–56 (remarks of S. Jerry Cohen); *id.* at 57–58 (remarks of Donald Turner); Note, *supra* note 8, at 109–10.

Shortly after the Supreme Court's *Schwinn* decision, Arnold, Schwinn & Co. took over the functions of its nine independent wholesale distributors. The case, however, is not typical. The company had few independent dealers; 75% of its distribution was by consignment which was upheld by the *Schwinn* decision. In the extensive literature on *Schwinn* published in the decade since that decision, no evidence is offered that forward integration by producers into distribution has been accelerated by the Supreme Court's ruling. The automobile and oil industries, which account for two thirds of all franchising sales, are examples of industries which have not integrated following antitrust decisions requiring the abandonment of vertical restraints on independent dealers. Such integration is unlikely, in the automobile industry, in the future. Schmitt, *supra* note 13, at 913. In the oil industry, the substantial diseconomies that would result from integration (Miller, Exclusive Dealing in the Petroleum Industry: The Refiner-Lessee Dealer Relationship, 3 Yale Econ. Essays 223, 232 (1963)) are a significant disincentive to distribution through company-owned outlets. *See* Comanor, *supra* note 13, at 1435–36 & n.32.

The following are illustrative of judgments that the net effect of the *Schwinn* prohibition of vertical territorial restraints will be to benefit small independent businesses:

Therefore, all this decision is saying, and what it really means is that a person in a dominant position cannot have the benefits accruing to a franchise system, and at the same time retain the benefit of being able to control the ultimate disposition of those goods.

So you have to make a decision, either you have an independent distribution system or you don't. . . . In the long run it [*Schwinn*] will probably be more beneficial to the smaller businessman than it will be harmful.

Panel Discussion, *supra* note 7, at 56 (remarks of S. Jerry Cohen).

Therefore, with the elimination of the location clause from franchise contracts, the freedom of dealers as to where and to whom they will sell will be increased. This probably will lead only to sporadic changes in the distribution pattern and will not affect the viability of the franchised distribution system. The *principal result of the demise of the location* will be the preservation of the dealer's freedom to do business. At least in some areas, intrabrand competition will be enhanced, and the manufacturers' stifling of intrabrand competition will be replaced by the operation of market forces.

Schmitt, *supra* note 13, at 909.

DUNIWAY, Circuit Judge (dissenting):

I dissent solely on the ground that, as Judge Kilkenny demonstrates in parts I and II of his dissenting opinion, the case of *United States v. Arnold, Schwinn & Co.,* 1967, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 is squarely in point. I agree with Judge Browning when he says that "[t]his should end the matter for an intermediate appellate court." I express no views as to the conflicting policy arguments that appear in the respective opinions of Judges Browning, Ely and Kilkenny. I cannot, however, refrain from making one small observation. I am puzzled by the notion that because the courts are not very well equipped to decide between conflicting notions of economic policy, they should pick one side of such an argument and erect it into a rule of per se illegality.